**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **ELIAS R. CAMACHO, JR.,** | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | |
| **v.** | § | **EP-12-CV-40-RFC** |
| | § | |
| **UNITED STATES OF AMERICA,** | § | |
| **Defendant.** | § | |
| | § | |
| | § | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is the motion for summary judgment filed by the United States of America ("Defendant") regarding claims of false arrest and false imprisonment brought by Elias R. Camacho, Jr., ("Plaintiff") under the Federal Tort Claims Act ("FTCA"). Defendant argues that any factual disputes are immaterial to the outcome of Plaintiff's claims because there was probable cause to arrest Plaintiff and he was then detained pursuant to a facially valid order by a court with jurisdiction to enter it. Plaintiff argues that there was neither probable cause to arrest nor to detain him and that there are factual issues material to such determinations that may affect the outcome of this action. Having thoroughly reviewed all of the pleadings, arguments, and evidence in the record, and reviewing the pertinent case law, the Court is of the opinion that Defendant's motion should be GRANTED as to Plaintiff's arrest on January 14th and his detention on January 19th, but that it should be DENIED as to Plaintiff's arrest on January 15th and his detention from that time until he was ordered detained by the Magistrate Judge on January 19th.

1

## PROCEDURAL HISTORY

Plaintiff filed his complaint on February 8, 2012, asserting a claim under the FTCA against Defendant and asserting a *Bivens* claim against Sharron M. Cannella; the cause was assigned to District Judge Kathleen Cardone.  Docket Entry ("D.E.") 1.  Defendants' motion to dismiss, filed June 11, 2012, was denied on August 27, 2012, as to Plaintiff's FTCA claim, but granted as to Plaintiff's *Bivens* claim; thus, Cannella is no longer a defendant in this cause. D.E. 8, 17.

Defendant filed an answer to Plaintiff's complaint on September 10, 2012.  D.E. 22.  The parties consented to have the cause tried by a United States Magistrate Judge, and the cause was reassigned to this Court on December 6, 2012.  D.E. 25.

Defendant filed a motion for summary judgment on September 30, 2013.  D.E. 36.  Plaintiff filed his response on October 30, 2013.  D.E. 42.  Defendant filed a reply on November 6, 2013.  D.E. 44.  Trial was reset for February 3, 2014.  D.E. 29, 38.

## PLAINTIFF'S REMAINING CLAIMS

Plaintiff asserts claims of false arrest and false imprisonment, alleging that he was arrested and detained by federal agents without his consent and without authority of law.  D.E. 1:4 ¶ 22.  Plaintiff claims that agents of the FBI delayed investigating his alibi and that the lead FBI agent included mistaken and mischaracterized facts in a probable cause affidavit submitted in support of the criminal complaint filed after Plaintiff was arrested.  D.E. 1:3-4 ¶¶ 13-18.

## ALLEGED FACTS

### Tuesday, January 12, 2010

At approximately 11:22 a.m. on Tuesday, January 12, 2010, there was a robbery of the First Federal Bank in El Paso, Texas.  D.E. 41-1:58.  Melissa Ramos, the teller involved in the robbery,

described the assailant as 5'4-5'5 weighing 130-140 pounds.  D.E. 36-1:3 ¶ 3, 41-1:91.  The FBI and

El Paso police released surveillance photos of the robber in a press release.  D.E. 36-1:3 ¶ 5.

**Wednesday, January 13, 2010**

On Wednesday, January 13, 2010, a person telephoned the tip line stating that Plaintiff "bore

a strong resemblance to" and "looked just like" the person in the released surveillance photos.  D.E.

36-1:3 ¶ 5, 41-1:59.  The caller identified herself as Plaintiff's friend.  *Id.*

Agents obtained and compared Plaintiff's photo with photos of the bank robber, Special

Agent Sharron M. Cannella, the lead investigator on the robbery, even went to his house to view him

in person,  and concluded that it was the same person.  D.E. 36-1:3 ¶ 6, 41-1:59.  Agent Cannella

learned that Plaintiff's records, most recent in 2007, listed him as 5'6-5'9, 185-220 pounds.  D.E. 41-

1: 97, 99.

**Thursday, January 14, 2010**

On Thursday, January 14, 2010, an FBI agent met with bank tellers present during the

robbery in order to show them a photo spread which contained Plaintiff's photo.  D.E. 36-1:3 ¶ 7,

41-1:93, 95.  Out of an array of six photos, Ramos selected Plaintiff's as the photo of the person

responsible for the robbery. *Id.*  Cardona was also presented six photographs; she selected Plaintiff's

photo as the person who resembled the man who robbed the bank; she rated her certainty that

Plaintiff was the robber as 8/10.  D.E. 41-1:95.

That same day, the FBI conducted surveillance of Plaintiff, during which time he made two

separate visits to the same Capital Bank branch in El Paso, making cash deposits of $111 and $100.

D.E. 36-1:3 ¶ 8, 41-1:59 ¶¶ 10-11.

3

Agent Cannella's case notes reflect that at 2:57 p.m., she called Assistant United States Attorney ("AUSA") Brandy Gardes, advised her of the "results of the photograph lineup, surveillance, and additional cash bank deposits." D.E. 41-1:50. AUSA Gardes approved a probable cause arrest. *Id*. At 3:06 p.m., Agent Cannella called Supervisory Special Agent ("SSA") Hector Camarillo, informed him of the AUSA's approval and provided him with an additional update of the case developments. D.E. 41-1:51. SSA Camarillo also approved a probable cause arrest. *Id*. Plaintiff was placed under arrest at 3:17 p.m. and taken to the station for an interview and processing. *Id*.

Plaintiff consented to a search of his house. D.E. 41-1:4 ¶12. Agent Cannella received communication at 3:39 p.m. advising her of the search status at Plaintiff's residence; she was notified that financial evidence involving $1,622 had been found, which was described on the receipt for property as "a receipt from Bank of America." D.E. 41-1:54, 85-87. That amount, combined with the two deposits Plaintiff made to an account at Capital Bank ($211) after the bank robbery, equaled the exact amount stolen in the bank robbery, $1,833. D.E. 41-1:59 ¶ 13.

In the interview after his arrest, Plaintiff said that he had gone to see an individual named Amy Ramirez at her place of business, Therm-O-Link, on Henry Brennan on the east side of El Paso the morning of the robbery for approximately twenty minutes, but he did not know the exact time. D.E. 41-1:4 ¶¶ 15-16.

At approximately 5 p.m., agents went to Plaintiff's father's house, showed him two of the bank surveillance photos and asked if it was Plaintiff. D.E. 41-1:31 ¶ 3-4. He told the agents that while there was some resemblance, it was not Plaintiff. *Id*. He told them that he had seen Plaintiff earlier that day because he had asked Plaintiff to stop by and pick up both a copy of a check for

$1,622 that needed to be returned to Copart Salvage Yard and the $100 that he owed Plaintiff for helping to return a stolen vehicle to the United States. D.E. 41-1:32 ¶ 5. He explained that he works with Copart and Gustavo Espinoza to retrieve stolen vehicles from Mexico and that the wrecker accidently gave Espinoza the carbon copy when he delivered the original check to Espinoza; Espinoza gave the check to him to return to Copart for their records; and he asked Plaintiff to return it for him. *Id*., at ¶ 6.

When Plaintiff's brother, Marco Camacho, a long-time United States Border Patrol Agent, arrived at their father's house, the agents showed him some photos from the bank surveillance and asked if the man in the photos was Plaintiff. D.E. 41-1:36 ¶ 1-3. Marco told them that he did not think it was Plaintiff. *Id*. While the man in the photos looked somewhat similar to Plaintiff, he pointed out specific details that made Marco believe it was not Plaintiff, including the fact that Plaintiff does not wear beanies nor the type of glasses worn by the man in the pictures. *Id*. ¶¶ 3-4. Marco at no time identified the man in the photos as Plaintiff. *Id*. ¶ 5.

At 5:37 p.m., after questioning Plaintiff, Agent Cannella informed SSA Camarillo that she was "[f]eeling iffy", was going to try to get a polygraph exam, and if she was not able to get it set up for that day, she may release Plaintiff and have him show up tomorrow for the polygraph test. D.E. 41-1:51. Plaintiff agreed to take a polygraph exam the following day and was released for the night on the advice of the FBI polygrapher to minimize the possibility of an inaccurate result. D.E. 36:3, 36-1:4 ¶ 12. Plaintiff was released at approximately 5:42 p.m. D.E. 41-1:51. If Plaintiff did not return in the morning to take the polygraph test, Agent Cannella planned to have a warrant issued for Plaintiff's arrest. *Id*.

**Friday, January 15, 2010**

Plaintiff reported to the El Paso FBI headquarters for the polygraph examination at 9 a.m. on January 15, 2010, with his mother, father, and wife.  D.E. 41-1:5 ¶ 20, 51.  Upon his arrival, he handed Agent Switzer the receipt for his lunch with his wife on January 12th and the Therm-O-Link business card for Amy Ramirez, with whom he had met the morning of January 12th.  *Id.*

Plaintiff's father recognized SSA Camarillo from when they worked together at the El Paso Police Department, and SSA Camarillo recognized him.  D.E. 41-1:32 ¶ 9.  They exchanged pleasantries and he told Plaintiff's father not to worry because SSA Camarillo had seen the bank photos, knew it was "not him," and Plaintiff would be released shortly after the polygraph test.  *Id.* Plaintiff's father mentioned Plaintiff's alibi and SSA Camarillo led him to believe the agents were already checking it out.  *Id.*

Plaintiff was very nervous taking the polygraph exam, the whole experience was chaotic and nerve wracking: he was afraid that it would show that he robbed the bank when he knew he did not, and the agent yelled at him, told him he was lying, and threatened to end the exam.  D.E. 41-1:5 ¶ 21.  The agent told Plaintiff that he had failed the exam and said that the machine never lies.  *Id.* Plaintiff told them to call Therm-O-Link, but they continued to ask him questions about January 12th; he explained to them again in detail what he had done that day, he prepared a statement in which he mentioned that he had given the agents the business card to check his alibi, which the agents witnessed and signed.  *Id.*  In the statement, he described arriving at Therm-O-Link between 10:30 a.m. and 10:45 a.m. and arriving home between 11:10 a.m. to 11:20 a.m..  D.E. 41-1:9.  He provided many details, including that the lights flickered on and off and then the power went out and came back on while he was there.  *Id.*

6

At 11:49 a.m. Agent Cannella spoke with SSA Camarillo regarding the results of the polygraph and he requested that she call AUSA Gardes to concur that there was probable cause to arrest. D.E. 41-1:51. Agent Cannella spoke with AUSA Gardes at 11:52 a.m. and informed her of the results of the interviews the night before and the results of the polygraph; AUSA Gardes approved a probable cause arrest. D.E. 41-1:51-52. Plaintiff was placed under arrest and transported to the El Paso County Detention Facility at 3:02 p.m. *Id.*

When Plaintiff's father was informed that Plaintiff failed the polygraph exam, he reminded the agents how unreliable the exams are and asked what had happened with Plaintiff's alibi information about where he was on the day of the robbery. D.E. 41-1:32 ¶ 10. He was led to believe that they had investigated it and it had not checked out. *Id.*

**Saturday -Monday, January 16-18, 2010**

Over the weekend, Agent Cannella performed a search for Amy Ramirez in an attempt to locate her home address. D.E. 36-1:4 ¶ 15. It was soon determined that, given the large number of people with the name Amy Ramirez in the El Paso area, it would be difficult to locate the correct person at home over the weekend, which happened to be Martin Luther King, Jr. Holiday weekend. *Id.* Agent Cannella determined that she would not be able to contact the alibi witness until Tuesday, the next business day.[1] *Id.*

---

[1]      In her affidavit, Amy Ramirez states that Therm-O-Link operates 24 hours per day, seven days a week. D.E. 41-1:40. Even when Ramirez is not working, a supervisor answers the phone and has access to Ramirez during her non-work hours. *Id.* Ramirez was present at work all day on the 15th. *Id.* Ramirez worked her regular shift from 7:30-4:30 p.m. on Monday, January 18th. *Id.* Although there is no evidence that any of the agents knew this information, there is no evidence that they asked any questions or took any action to discover it; instead they assumed they could not find nor contact her till Tuesday the 19th. There is no allegation that any agent called Therm-O-Link to contact Ramirez on Thursday, Friday, Saturday, Sunday, or Monday. Meanwhile, a credible, disinterested alibi witness was ready, willing and able to talk with agents.

**Tuesday, January 19, 2010**

Agent Cannella sent a draft of the criminal complaint against Plaintiff to AUSA Gardes at 6:11 a.m. on Tuesday, January 19, 2010.  D.E. 41-1:55.  She sent her a shorter version of the complaint at 8:33 a.m., received approval for the complaint from AUSA Gardes at 9:01 a.m., and received a request from AUSA Gardes for a motion to detain at 9:14 a.m. *Id.* Agent Cannella's affidavit in support of the complaint alleged several facts supporting probable cause to arrest Plaintiff, including: (1) photos of the robber were released on January 12, 2010; (2) a person, stating she was a friend of Plaintiff's, called in and said the picture looked just like Plaintiff; (3) on Thursday two tellers involved in the robbery identified Camacho out of a photo spread; (4) Special Agent Cannella went to Plaintiff's house on January 13 and after seeing him concluded that he was the same person depicted in the robbery photos; (5) a search of Plaintiff's residence revealed a bank transaction receipt for an amount which combined with his two deposits equaled the amount stolen; and (6) subsequent to Plaintiff's arrest, his brother identified Plaintiff as the person in the bank surveillance photos.  D.E. 41-1:58-59.        At 11:27 a.m., Agent Cannella received information from someone that Plaintiff had at some point embezzled money from a restaurant business.  D.E. 41-1:55.

When agents went to the Therm-O-Link business address listed on the business card provided by Plaintiff and interviewed Amy Ramirez, she told them that Plaintiff had been there some time between 10 a.m. and 11:30 a.m. on January 12, 2010, and was there for approximately a half hour. D.E. 41-1:44.  Plaintiff was at the business during a power outage—both when the power went out and when it returned— and Ramirez mentioned it takes a long time for the machines to restart.  D.E.

36-1:5 ¶ 18, 41-1:45.  Ramirez could not vouch for the exact time of the meeting or the power outage in relation to the time of the robbery.  *Id*.  Plaintiff had sent her an email addressing some of her questions at 12:10 p.m.  *Id*.

Agent Cannella spoke with several other Therm-O-Link employees and attempted to obtain video surveillance, but was unable to establish when Camacho was at the business.  D.E. 36-1:5 ¶ 18, 41-1:45.  Although the business has video cameras, due to technical difficulties, the agents were unable to access the video.  *Id*.

Approximately 15 minutes after the agents left the business, Ramirez contacted Agent Cannella and told her that Bustamante, a Therm-O-Link employee, had noted that the power outage had occurred around 11:16 a.m. on January 12, 2010, such that Plaintiff was at the business from at least 11:16 a.m. through 11:30 a.m.  D.E. 41-1:45.  Ramirez also told the agents that she did not recall ever seeing Plaintiff in a "beanie."  *Id*.

Agent Cannella left a voice mail message for AUSA Gardes at 1:20 p.m. on January 19th, to advise her of the results of the interview with Ramirez.  D.E. 41-1:52.

Attempts to return to Therm-O-Link to re-interview Ramirez during business hours that same day were unsuccessful.  D.E. 36-1:5 ¶ 19.  Ramirez had previously provided only her work contact information, and public database searches were fruitless.  *Id*.

The criminal complaint, supported by Agent Cannella's affidavit, was signed by United States Magistrate Judge Margaret Leachman, and Plaintiff was orally ordered detained during his initial appearance.  D.E. 41-1:57.

**Wednesday, January 20, 2010**

At some point on Wednesday, January 20, 2010, FBI agents returned to again interview Ramirez, who confirmed that an employee had documented the time of the outage and that Plaintiff, Ramirez, and another employee had been together in the front office at the time of the outage. D.E. 36-1:5 ¶ 20.  The information was deemed credible.  *Id.*  Agent Cannella's affidavit states that after she learned of this information, she contacted AUSA Gardes, advised her of the situation and requested that Plaintiff be released from jail.  D.E. 36-1:6 ¶ 20.  Case notes reflect that at 7:15 p.m. on Wednesday, January 20, 2010, Agent Cannella spoke with AUSA Gardes to advise her of the results of the interview/re-interview with Ramirez and agreed to update her with the results of the additional interviews to be conducted on January 21, 2010.  D.E. 41-1:52.  There is no indication in the record who these additional interviews were with or for what reason.

**Thursday, January 21, 2010**

An order of dismissal was submitted to the clerk's office on Thursday, January 21, 2010. D.E. 36-1:11.

**Friday, January 22, 2010**

Plaintiff was released from jail at some point on Friday, January 22, 2010.  D.E. 41-1:6 ¶ 22. His experience in the jail during those six nights and seven days was chaotic, frightening, and demoralizing.  *Id*.

**DISCUSSION**

**I.    Summary Judgment Standard**

Summary judgment is appropriate when the pleadings and evidence establish that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986). An issue is material only if its resolution could affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2513 (1986).

In reviewing a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party and disregard all evidence favorable to the moving party that the trier of fact is not required to believe. *Haverda v. Hays County*, 723 F.3d 586, 591 (5th Cir. 2013), *citing Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-151, 120 S.Ct. 2097, 2110 (2000). Although conclusory allegations are not competent summary judgment evidence and are insufficient to defeat a motion for summary judgment, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), all justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Liberty Lobby, Inc.*, 477 U.S. at 255.

> If the record [taken as a whole], viewed in this light, could not lead a rational trier of fact to find for [the nonmoving party], there is no genuine issue for trial, and summary judgment is proper. If, on the other hand, the fact finder could reasonably find in [the nonmovant's] favor, then summary judgment is improper.

*Kelley v. Price-Macemon, Inc*., 992 F.2d 1408, 1413 (5th Cir. 1993) (internal citations omitted).

Plaintiff lists five fact issues in dispute: (1) whether Plaintiff told Agent Cannella on January 14th the name of the business where he was the morning of the bank robbery; (2) whether Plaintiff told Agent Cannella that on January 14th he was at that business from 9:30 a.m. to 10 a.m.; (3) whether Marco Camacho identified Plaintiff as the person in the bank surveillance photos; (4) whether Agent Cannella misrepresented the copy of the check, made from Copart to Gustavo Espinoza, as a "bank transaction receipt;" and (5) whether Agent Cannella neglected to forward easily verifiable alibi information to the AUSA. DE 42:6-10.

**II.      FTCA- False Arrest & False Imprisonment**

Plaintiff filed suit against the Defendant pursuant to the FTCA, 28 U.S.C. § 2671, et. seq., for the common law torts of false arrest and imprisonment.  Under the FTCA, the United States may be held liable "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  Plaintiff, a Texas resident, complains of an arrest and detention that occurred in Texas. Thus, Plaintiff's claim is governed by Texas law.  *See Lundy v. United States*, No. V-06-69, 2009 WL 81924, at *5 (S.D. Tex. Jan 12, 2009) (Texas state law controlled liability for false arrest and imprisonment claim brought under FTCA), citing *Hannah v. United States*, 523 F.3d 597, 601 (5th Cir. 2008).

Under Texas law, the same elements are required for both false arrest and false imprisonment.  *Whirl v. Kern*, 407 F.2d 781, 790 (5th Cir. 1968). For either claim, a plaintiff must show that the defendant caused (1) a willful detention of the plaintiff; (2) without the plaintiff's consent; and (3) without authority of law.[2]  *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002).

Lack of legal authority is the only contested element in this case.

---

[2]      Want of probable cause is not an element of a claim for false imprisonment under Texas law, and where an arrest or detention is pursuant to facially valid process, there is no false imprisonment.  *See Bossin v. Towber*, 894 S.W.2d 25, 31-32 (Tex. App. — Houston [14th], 1994).  A constitutional claim of false arrest or imprisonment, on the other hand, always requires a showing of no probable cause.  *Bown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001).  Plaintiff cannot raise a constitutional tort claim under the FTCA.  *F.D.I.C. v. Meyer*, 510 U.S. 471, 478, 114 S.Ct. 996, 1001 (1994).

### III.    Warrantless Arrests

Plaintiff was arrested initially on January 14 and again on January 15, 2010; both were warrantless arrests.  Defendant asserts that Plaintiff was arrested and detained pursuant to the lawful statutory authority given FBI agents "to make a warrantless arrest whenever there are 'reasonable grounds to believe that the person to be arrested has committed' a felony under the laws of the United States."  D.E. 36:9, quoting 18 U.S.C. § 3052.  It is uncontested that Plaintiff was arrested for committing a bank robbery of an FDIC insured institution, such that the robbery would be a felony under the laws of the United States, 18 U.S.C. § 2113(a).  DE 36:9 n5.

The "reasonable grounds" required by the statute is equivalent to the probable cause standard generally required for a warrantless arrest and by the Fourth Amendment of the Constitution.  *See United States v. Campbell*, 575 F.2d 505, 507 (5th Cir. 1978).  Thus, the existence of probable cause defeats any claim for false arrest and imprisonment based on a warrantless arrest.  *See Nunez v. Jiminez*, No. 04-07-403-CV, 2007 WL 4320822, at *3 (Tex. App.—San Antonio, Dec. 12, 2007, no pet.) (Explaining that a false arrest/false imprisonment claim based on an allegedly improper warrantless arrest turns on whether there was probable cause for the arrest).  Probable cause is not retroactively cancelled nor the FBI's actions rendered "without authority" by the mere fact that the innocence of the suspect is later proved.  *Pierson v. Ray*, 386 U.S. 547, 555, 87 S.Ct. 1213 (1967)).

The parties disagree on whether Defendant had probable cause to arrest Plaintiff on either January 14 or January 15.

### A.    Probable Cause Standard

Probable cause is a nontechnical concept that attempts to strike a balance between society's interest in effective law enforcement and protection of law-abiding citizens.  *Brinegar v. U.S.*, 338

13

U.S. 160, 175, 69 S.Ct. 1302 (1949).  It is not an exact science.  *Id*., at 175-176.   "It  is a fluid concept- turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules.  *Mendenhall v. Riser*, 213 F.3d 226, 232 (5th Cir. 2000), quoting *Illinois v. Gates*, 462 U.S. 213, 241, 103 S.Ct. 2317 (1983).  The court must embark on a "practical, common-sense determination whether given all of the circumstances" a reasonable officer could have believed "there is a fair probability that the plaintiff committed the crime.  *Id*., at 238.

The probable cause threshold is relatively low; it "does not require a showing that the officer's belief [in the suspect's guilt] was correct or that it was more likely true than false[.]" *Gordy v. Burns*, 294 F.3d 722, 729 (5th Cir. 2002), *citing Piazza v. Mayne*, 217 F.3d 239, 246 (5th Cir. 2000), abrogated and overruled on other grounds by *Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003).  Probable cause to arrest, however, exists only when the totality of facts and circumstances within the officer's knowledge at the time of arrest, and as the officer honestly and reasonably believed them to be, would excite in the mind of a reasonably competent officer, a prudent person and one of reasonable caution, a belief that there is a "fair probability" that the suspect was guilty of a crime.  *Gordy*, 294 F.3d at 729 (reasonably and honestly believed, fair probability); *Piazza*, 217 F.3d at 246 ("prudent person, or one of reasonable caution"); *Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2000) (reasonable person, at the moment of arrest).

The mere fact that there may exist some exculpatory evidence, or that the officer is aware of facts that when combined could suggest that the suspect may not be guilty of the offense, does not undermine the existence of probable cause, so long as a reasonable officer, when considering the totality of the facts and circumstances known to the officer, could find a basis to believe to a fair probability that the suspect did commit the crime.  *See Gordy*, 294 F.3d at 729; *Rakun v. Kendall*

14

*County*, No. SA-06-CV-1044-XR, 2007 WL 2815571, at *12 (W.D. Tex. Sept. 24, 2007). For instance, probable cause is not destroyed by a suspect merely denying that he committed the crime, nor by argument or evidence presented by the suspect to support such denial, none of which is necessarily inconsistent with the suspect's guilt. *Glenn v. City of Tyler*, 242 F.3d 307, 313 fn. 3 (5th Cir. 2001); Rakun, 2007 WL 2815571, at *16 (suspect's story did not contradict complainant's). However, in establishing probable cause, facts tending to dissipate the reasonableness of believing in the suspect's guilt to a fair probability may not be disregarded. *Evett v. DETNTFF*, 330 F.3d 681, 688 (5th Cir. 2003), citing *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988).

### 1.    Eyewitness Identification

Eyewitness identification is generally sufficient to establish probable cause to stop a suspect. *United States v. Burbridge*, 252 F.3d 775, 778 (5th Cir. 2001). "An eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Id.*, quoting *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999). Eyewitness identification, therefore, does not trump the totality of circumstances, but must be considered in light of such circumstances, including any apparent reason for the officer to doubt the identification. *See McBride v. Crime Stoppers*, 41 F.3d 661, 1994 WL 684541, at *4 (5th Cir. 1994) (unpublished) (considering totality of circumstances where there were discrepancies with eyewitness identification and original description).

This includes the facts and circumstances surrounding the eyewitness identification itself. Some identifications may provide stronger support for probable cause while others may be more susceptible to dissipation.  For example, in *Burbridge*, the eyewitnesses saw the suspect in

15

possession of a gun as he got on his motorcycle; they called the police to report what they had seen and followed the suspect until the police arrived; then they indicated to the police who it was that they had seen with the gun. *Burbridge*, 252 F.3d at 777-778.  At the other end of the spectrum, a suggestive or coerced identification  may be undermined by the mere facts and circumstances of the identification procedure, such that it would not reasonably support a finding of probable cause, especially standing alone.  The majority of identifications, such as the one in this case, fall between these extremes.

This totality of circumstances also includes those independent of the eyewitness identification.  For instance, in *McBride*, the court considered the totality of circumstances in finding that probable cause existed despite a failure to disclose discrepancies between the identified suspect and the complainant's original description of the robber (no acne or scars, no scar over right eye, no dark eyebrows).  *McBride*, 1994 WL 684541, at *4.  The court considered the general age and appearance originally described, the positive identification both during a line-up and in a photo array, an anonymous third person identification of the robber through Crime Stoppers, and the fact that McBride had given inconsistent statements regarding his whereabouts on the day of the robbery.  *Id.*

There is a factual disagreement regarding whether Marco Camacho identified Plaintiff as the bank robber:  Agent Cannella's affidavit in support of the complaint stated that he did; Marco Camacho's affidavit provided for this proceeding states emphatically that he did not.  D.E. 41-1:36 ¶ 5, 59 ¶ 15.  Marco swears to the contrary that he pointed out specific details in the photo to demonstrate the man in the photo was not his brother, though he did look somewhat similar to Plaintiff. D.E. 41-1:36 ¶¶ 3-4.

16

Defendant argues that even assuming Plaintiff's brother pointed out dissimilarities between Plaintiff and the person in the bank surveillance photo, this would not undermine probable cause based on the bank tellers' eyewitness identifications.  D.E. 44:9-10.  The discrepancies identified by Plaintiff's brother—that Plaintiff  never wore the type of hat nor had the type of glasses worn by the man in the bank photos—may not completely eviscerate the probable cause established by the presence of eyewitness identification, when they are viewed in isolation, but neither does the mere existence of an eyewitness identification relieve the officers or the court from considering the totality of the circumstances.

Plaintiff argues that the witnesses were not in constant view of the robber from the time of the robbery to the time of their identifications.  Nor were the eyewitness identifications done in person.  Rather, the witnesses selected Plaintiff's photo as the one that "resembled" the robber from a photo array two days later, in which they were unable to observe the height or weight of the persons in the photos.  This may have been significant since there was a discrepancy, about which the agents were aware, regarding Plaintiff's height and weight and the witness's initial description of the robber.  Further, the witnesses viewed the robber while he was wearing a hat and glasses.  It is not clear from the record whether these were sunglasses or prescription glasses.  Nor does the record  reflect whether any of the people in the photo array were wearing hats or glasses.  One of the witnesses expressed her own doubt by rating her certainty as an 8 out of 10.   Besides the circumstances of the eyewitness identification itself, the following information weighs against probable cause. Agent Camarillo told Plaintiff's father that he knew Plaintiff was not the man in the bank photos.  D.E. 41-1:32.  Plaintiff's father, who had worked in the El Paso Police Department, was certain Plaintiff was not the man in the photos.  *Id*.  Plaintiff's brother, a long-time United States

Border Patrol Agent, was also certain Plaintiff was not the man in the photos.  D.E. 41-1:36.
Plaintiff did not tell conflicting stories, but provided specific details of his day and provided contact
information for someone he claimed could easily verify his alibi.

### 2.    Failure to investigate

Plaintiff contends that Agent Cannella failed to communicate Plaintiff's alibi to the AUSA
or the court for consideration in the probable cause determination, and failed to diligently investigate
it to confirm or dispel suspicion.  D.E.42:10.  Defendant argues that it is immaterial because the mere
fact that Plaintiff provided an alibi did not impose a duty to investigate it before arresting him, the
agents did later investigate his alibi, and when it checked out, he was released.  D.E. 44:14.  The
mere fact that a suspect denies guilt or provides an alibi might not have much of an affect on a
probable cause determination.  The facts and circumstances of the proffered alibi and the facts and
circumstances in which it is given[3] may greatly affect the determination.

During an investigative detention, officers do have a duty to "diligently pursue[] a means of
investigation that [is] likely to confirm or dispel their suspicions quickly[.]"  *See Short v. West*, 662
F.3d 320, 327 (5th Cir. 2011), *citing United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568
(1985) and *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868 (1968).  The Fifth Circuit, however, has not
recognized a general independent duty for law enforcement officers to conduct a reasonable

---

[3]    For example, the Court suggests that a probable cause determination might be greatly
affected by an alibi depending on the amount of verifiable detail provided; whether the alibi
remained reasonably consistent; whether there may be business records to support the story, and
how easily such records could be obtained; whether the suspect was alone, alibi witnesses might
be located, or there is a known alibi witness, and whether such witness would be difficult or easy
to find or contact, and whether such witness would likely be biased, such as family or friends, or
impartial; and of course the totality of other circumstances including the strength or weakness of
the suspect's identification.

investigation of the available evidence before making an arrest once the totality of the circumstances would support finding probable cause; an officer's failure to investigate further before making an arrest, therefore, is actionable only insofar as it may negate the existence of probable cause. *Rankun v. Kendall County*, Tx, 2007 WL 2815571 at *12 (W.D. Tex. 2007) (unpublished), citing *Kuehl v. Burtin*, 173 F.3d 646, 650-651 (8th Cir.l 1999) (explaining an officer's duty to investigate before arrest), and *Gaines v. Asaro*, 246 Fed. Appx. 244, 246, 2007 WL 2007545 **2 (5th Cir. 2007) (finding 5th Circuit not bound by decisions of other circuits recognizing a general duty to investigate).

In the Eighth Circuit, "law enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as law enforcement would not [be] unduly hampered ... if the agents ... wait[] to obtain more facts before seeking to arrest[.]" *Kuehl*, 173 F.3d at 650-51 (internal citations omitted).  However, the Eighth Circuit cited the Fifth Circuit in adding " ... but probable cause does not exist when a 'minimal further investigation' would have exonerated the suspect." *Id*., citing *Bigford*, 834 F.2d at 1219 (5th Cir. 1988).  Yet even under that duty, officers are not required to investigate a suspect's denial or alibi further before arresting where, when it is considered with the totality of the circumstances, probable cause already exists. *Id*.  For example, in *Brodnicki*, the court found that the officers' failure to investigate the suspect's denial of guilt or his alibi—that he was home alone, before arresting him was not unreasonable based on the facts and circumstances known at the time of the arrest, including a complainant who appeared to be credible, gave specific descriptions and detailed account, and the suspect's car found in the vicinity. *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1263-1264 (8th Cir. 1996).  In *Criss*, the court found that further investigation was not

required before making a probable cause arrest where the suspect provided the plausible explanation that his roommate owned the stolen signs hanging in living room, because even assuming truth of his explanation, there was probable cause to arrest.  *Criss v. City of Kent*, 867 F.2d 259 (6th Cir. 1988) ().  This duty is consistent with the reasoning that "an officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." *Id.*., at 650, citing *Bigford*, 834 F.2d at 1218.

In the Tenth Circuit, police must "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all [, though police need not necessarily interview alleged alibi witnesses,] before invoking the power of warrantless arrest and detention." *Romero v. Fay*, 45 F.3d 1472, 1476-77 (10th Cir. 1995).  Further, "[w]hile officers may weigh the credibility of witnesses in making probable cause determination, they may not ignore *available and undisputed* facts." *Baptiste v. J.C. Penny Co.*, 147 F.3d 1252, 1259 (10th Cir. 1998).

This is also consistent with the probable cause standard requiring an objectively reasonable person, a prudent person, a person of reasonable caution.  In the Fourth Circuit, probable cause did not exist where an officer "simply did not bother to do what any police officer acting reasonably in the circumstances would have done to clarify the factual situation[;]" interview witnesses at the scene of the accident who would have corroborated plaintiff's version of the story.  *Sevigny v. Dicksey*, 846 F.2d 953, 957-58 (4th Cir. 1988).  In the Seventh Circuit, probable cause did not exist when a "minimal further investigation" would have exonerated the suspect, though an officer need not conduct a mini trial before making an arrest.  *See BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) (an officer may not close eyes to facts that would help clarify the circumstances of an arrest);

20

*see also Bigford*, 834 F2d at 1219 (The Fifth Circuit found that the fact that a reasonable police officer would have been placed on notice that further inquiry was indicated, while insufficient to vitiate probable cause when it otherwise existed, was an important factor militating against a finding that probable cause exists.)

The court must determine whether Plaintiff's undisputed factual allegations known to the officers at the time of arrest demonstrate a lack of probable cause, i.e., would a reasonable person have been able to form a belief of fair probability of guilt without further investigation to confirm or dispel facts known to be alleged at the time of arrest?  After all, although the mere "existence of exculpatory evidence does not negate probable cause if the totality of the circumstances would support a reasonable conclusion of criminal activity[,]" *Twine v. City of* Houston, No. H-08-1234, 2008 WL 4240157 *3 (S.D. Tex. 2008), citing *Gordy*, 294 F.3d at 729 (5th Cir. 2002), officers "may not disregard facts tending to dissipate probable cause." *Evett*, 330 F.3d at 688.

Many of Plaintiff's alleged factual disputes involve his alibi: when and what he told Agent Cannella and whether she communicated Plaintiff's alibi to the AUSA.  D.E. 42:6-7, 10.  Plaintiff argues that probable cause did not exist when the totality of the circumstances known at the time of arrest are considered, and that because the police did not have probable cause, they should have continued to investigate to confirm or dispel their suspicions.  Had they done so, they would have determined that his alibi checked out and he would not have needlessly spent a week in jail.

Plaintiff voluntarily presented himself for the polygraph on January 15th at 9 a.m., and was not arrested until 3:02 p.m.  D.E. 41-1:51-52.  The officers pursued a polygraph examination as a means of investigation to confirm or dispel their suspicions.  *See Short v. West*, 662 F.3d at 327. Apparently the agents understood the test could be affected by, and possibly result in a "false

21

positive indication[] of deception due to stress or discomfort in the subject[,]" such as nervousness Plaintiff alleges he experienced during the exam due to the questioning techniques employed.  D.E. 36:3 n. 2.  Plaintiff purportedly failed the exam. D.E. 41-1:5 ¶ 21.  There is no evidence in the record as to which questions reflected deception, such that the court cannot determine how the polygraph results could affect the weight of Plaintiff's consistent alibi information in consideration of the totality of the circumstances.  Thus, the Court cannot conclude that the polygraph dispelled doubt which objectively should have been raised by his consistent, detailed, and sworn alibi—that he met with Ramirez at 10:45 a.m, drove straight home, and arrived home at 11:15 or 11:20 a.m.—provision of contact information for a specific alibi witness, and repeated pleas to call her.  D.E. 41-1:8-9.

### 3.    Full and Fair Disclosure

Plaintiff contends that there are material factual questions regarding whether Agent Cannella neglected to forward easily verifiable alibi information to the AUSA, whether Agent Cannella incorrectly conveyed that Plaintiff's brother had identified Plaintiff as the person in the bank photo, and whether Agent Cannella had inaccurately described evidence found at Plaintiff's house.  D.E. 42:8-10.  Plaintiff's allegations regarding how Agent Cannella  conveyed or failed to convey the information to the AUSA, the SSA, or the magistrate court reviewing the complaint and affidavit, does not appear to be contradicted by any evidence in record and is supported by Agent Cannella's affidavit in support of the criminal complaint.

> A person causing a criminal complaint to be filed does so on probable cause where he makes ***full and fair disclosure of the facts and circumstances known to him*** and, on the basis of that disclosure, the complaint is filed.  This requires the initiating or cooperating party to report all material facts known to him, including facts, which if investigated further, might lead to a determination that the accused was not guilty.  If the reporting party does not in good faith disclose all material facts known to him, probable cause does not exist.

22

*Chandler v. United States*, 875 F.Supp. 1250 (N.D. Tex. 1994) (emphasis added); DE 42:10.

Agent Cannella sought a determination regarding probable cause to arrest from both the AUSA and the SSA, and an order from the court regarding probable cause to detain, all of whom made their determinations based on the information related to them by Agent Cannella. Thus, what information she conveyed is relevant. If she failed to include information that was potentially exculpatory or, which if investigated further might exonerate the suspect, the probable cause determination was not based on the totality of the circumstances, only on the circumstances supporting probable cause. Assuming Agent Cannella's affidavit reflected her understanding of the evidence at the time of arrest on the 15th as well, the probable cause determination both to arrest and detain may have been based on incorrect and misleading statements as well.

Defendant argues that Plaintiff's contention is irrelevant, however, because it is not the subjective determination of the participants at issue, but whether, objectively, considering the totality of the circumstances, there was probable cause to arrest and detain. Analogizing to an affidavit submitted in support of a warrant, a warrant's validity is not destroyed by alleged deficiencies in the affidavit unless: (1) the party challenging the warrant establishes by a preponderance of the evidence that the affidavit contains a material misstatement or an omission of material fact made knowingly, intentionally, or with reckless disregard for the truth; and (2) setting any erroneous statement aside, and considering any omitted material fact, the affidavit's remaining content is insufficient to establish probable cause. *See Franks v.* Delaware, 438 U.S. 154, 155-56 (1978) (search warrant, issue of first impression finding for Fourth Amendment purposes veracity of sworn affidavit could be challenged in limited circumstances, in a hearing); *Janecka v. State*, 937 S.W.2d 456, 462 (Tex.

Crim. App. 1996) (applying *Franks*); *Jeffs v. State*, No. 03-10-272-CR, 2012 WL 601846 at *8 (Tex.

App.—Austin 2012) (assuming without deciding that *Franks* applies to omissions, such that the

omitted facts should be considered in determining whether probable cause existed; recognizing that

neither the Supreme Court nor the Texas Court of Criminal Appeals had decided the issue, but

several lower courts had found *Franks* applies to omissions).  Defendant argues that probable cause

existed to arrest and detain Plaintiff, such that Plaintiff would not be entitled to relief, even if he

could show that Agent Cannella  knowingly, intentionally, or recklessly provided misinformation

or omitted material information from her reports to the court, and presumably to the AUSA or the

SSA.  DE 36:15, citing *Rios v. State*, 376 S.W.3d 238, 241-242 (Tex. App.—Houston [14thDist.]

2012, no pet.) (Sufficient other facts to support probable cause to arrest were found in the remainder

of the affidavit where misleading statement regarding a positive identification was deleted.).

With the above standards in mind, the Court will consider whether when viewing the totality

of the circumstances in the light most favorable to Plaintiff, a reasonable officer could have found

probable cause to arrest.

### B.      Probable Cause to Arrest on January 14th

Regarding Plaintiff's arrest on January 14th, Plaintiff contends there are several material

factual disputes: (1) whether he told Agent Cannella the name of the business where he had a

meeting the morning of January 12th; (2) whether he told her he was there from 9:30 a.m. to 10 a.m.;

and (3) whether she misrepresented the copy of the check.  D.E. 42:6-10.

Agent Cannella states in her affidavit that Camacho did not tell her that he had been with

Ramirez at the time of the robbery— around 11:22 a.m., suggesting that she did not understand his

meeting with Ramirez to be an alibi, because he still could have robbed the bank on the westside if

24

he left the east side around 10 a.m., and that he provided neither the name of the company nor her contact information that day.  D.E. 36-1:4.  Plaintiff contends that she never told him when the robbery took place and never asked him whether he was with Ramirez at that time, she only asked whether he was with Ramirez from 9:30 a.m to 10 a.m.  DE 42:8.  Agent Cannella's affidavit states that this discussion occurred after Plaintiff's arrest on the 14th.  D.E. 36-1:4.  Plaintiff says that Agent Cannella did not speak to him until after his arrest.  D.E. 41-1:4 ¶¶ 12-14.

Since it is uncontested that they did not discuss his whereabouts until after his arrest, such information would not have been within the totality of the circumstances to consider in determining probable cause on Thursday January 14th at the time Plaintiff was arrested.  Thus, though there does appear to be some factual dispute as to the information he conveyed about his alibi, it is not material to Plaintiff's arrest on the 14th.

The contested copy of the financial document was also discovered after Plaintiff's arrest on the 14th.  Although Agent Cannella refers to advising AUSA Gardes about "additional cash bank deposits" at 2:57 p.m. in her case notes—Plaintiff was arrested at 3:17 p.m.— her communications log shows that she was advised of the search status at Plaintiff's residence at 3:39 p.m.  D.E. 41-1:50-51, 54.  In her deposition, she indicated that she received information about the evidence found in the search of Plaintiff's house during the course of the interview, and that the agents told her they found a receipt.  D.E. 41-1:85-87.  Thus, even though the nature and description of the evidence is disputed, such dispute is not material to Plaintiff's arrest on the 14th, because it was not a part of the totality of the circumstances that should have been considered at the time of his arrest.  None of Plaintiff's other factual disputes would be relevant or material to his January 14th arrest.

At the time Plaintiff was arrested on the 14th, the officers knew the following: There had

been a robbery.  Someone claiming to be Plaintiff's friend identified Plaintiff as bearing a strong

resemblance to and looking just like the man in the bank surveillance photos released to the public.

Two bank tellers selected Plaintiff's picture from a photo array as the person who robbed the bank.

Various agents agreed that Plaintiff, viewed both in photos and in person, appeared to be the person

in the bank photos.  Plaintiff had made two bank deposits on the 14th; one for $100 and one for

$111.  When Plaintiff was arrested on the 14th, the only facts detracting from the probability that

Plaintiff was the robber were: one of the tellers had initially described the robber as shorter and

thinner than Plaintiff's last record reported him to be and the other qualified her identification as an

8/10 certainty.

Given the totality of the circumstances known to the officers at the time Plaintiff was arrested

on the 14th, and given that there are no factual disputes material to that arrest, it appears Defendants

had probable cause to arrest Plaintiff at that time and are therefore entitled to judgment as a matter

of law with respect to Plaintiff's brief detention from approximately 3:17 p.m. to 5:42 p.m. on

January 14, 2010.

**C.      Probable Cause to Arrest on January 15th?**

Although there is a dispute whether Plaintiff told Agent Cannella on January 14th the name

of the business where he was on the 12th and whether he was there at the time of the robbery, there

is no dispute that he did so on January 15th.  D.E. 41-1:5-6, 8-9.  There remain three factual

allegations relevant to the totality of the facts and circumstances at the time of Plaintiff's arrest on

the 15th: (1) whether Marco Camacho identified Plaintiff as the person in the bank photos, (2)

26

whether Agent Cannella misrepresented the copy of the Copart check made out to Enriquez, and (3) whether she neglected to communicate Plaintiff's easily verifiable alibi information to the AUSA.

Marco Camacho provided an affidavit stating that he never identified his brother as the person in the bank photos, though he did acknowledge a resemblance; Agent Cannella stated that he did identify Plaintiff as the bank robber.  D.E. 41-1:36, 59.  This factual issue is a significant part of the totality of the circumstances that should have been considered in the probable cause determination.  An identification by a family member, who would be most familiar with the suspect, would certainly lend great weight to the probability of Plaintiff's guilt.  Likewise, a family member, most familiar with the suspect, pointing out distinguishing characteristics between the suspect and the person in the bank photos, while recognizing the similarity, would decrease at least some weight from the probability of Plaintiff's guilt.  In conjunction with their father's and Agent Camarillo's certainty that Plaintiff was not the person in the photograph and the issues with the eyewitness identification, the probability of guilt could be greatly reduced.  This factual issue is material because, in light of the totality of the circumstances, it could affect the outcome.

In the probable cause affidavit submitted to the court on the 19th, Agent Cannella described the copy of the CoPart check made out to Enriquez as "a bank transaction receipt" in the amount of $1,622. D.E. 41-1:59.  Agent Cannella could not obtain clarification from the bank whether the copy was of a money order, a cashiers check, or a check drawn from a business account at the bank.  D.E. 41-1:87.  Evidence that Plaintiff made three bank transactions totaling the amount stolen in the robbery would weigh heavily towards probability of Plaintiff's guilt.  That weight would be greatly reduced if not eliminated by consideration of the following facts: the transaction receipt for $1,622 was in the form of a copy of a check made from a company to a person not Plaintiff; Plaintiff's father

explained what the check represented and why Plaintiff had it in his possession when he was questioned on January 14th after Plaintiff was arrested and while Plaintiff was being interviewed; and when questioned in the interview, Plaintiff gave the same innocent explanation.  To the extent Agent Cannella's description in the affidavit reflects how she viewed the evidence and how she described the evidence to the SSA and the AUSA, whether this description was incorrect, misleading, or reasonable is material to the probable cause determination.

With respect to Plaintiff's alibi, the record merely reflects that Agent Cannella advised AUSA Gardes of the interviews conducted the night before and the results of Plaintiff's polygraph; it neither confirms nor negates that Agent Cannella communicated Plaintiff's alibi information to AUSA Gardes for her to consider in making a probable cause determination.  D.E. 41-1:51-52. Plaintiff's father stated that he had mentioned Plaintiff's alibi to SSA Camarillo, who requested Agent Cannella call AUSA Gardes to concur with a probable cause arrest when he was informed of the polygraph results.  D.E. 41-1:32, 51.  If Agent Cannella did not convey the alibi information, it suggests that Agent Cannella disregarded potentially exculpatory evidence and that AUSA Gardes did not make her determination of probable cause based on full and fair disclosure of all the material facts and circumstances.  In determining whether probable cause existed, the Court must consider the affect the allegedly omitted alibi information may have on the totality of the circumstances.

Assuming all facts and reasonable inferences therefrom in Plaintiff's favor, at the time Plaintiff was re-arrested on Friday, January 15, 2010, the agents knew the following:  A tip had been received that the assailant looked like Plaintiff. Agents had determined that Plaintiff did appear to be the assailant, both in photos and in person.  Plaintiff had been identified in a photo array by two bank tellers, one of whom had only an 8/10 certainty, and the other who had previously described

the assailant as shorter and lighter than the officers knew Plaintiff's records to show, though such details were not apparent from the photos.  Plaintiff's father, a former police officer, and brother, a current border patrol agent, agreed that Plaintiff looked similar to the assailant in the bank photos, but disagreed that it was Plaintiff; his brother provided some specific reasons why the person in the bank photo was not Plaintiff, including that Plaintiff never wore the type of hat or glasses the robber had on in the bank photo.  Agent Camarillo did not think that Plaintiff was the person in the bank photos.

The agents knew that Plaintiff had made two bank deposits and had a copy of a check in his possession that together suspiciously totaled the amount stolen from the bank.  Agents had obtained consistent plausible innocent explanations regarding the significance of the check copy and why it was in Plaintiff's possession, from both Plaintiff and Plaintiff's father.  Such information would have been verifiable by at least two other sources.

The agents knew that Plaintiff had provided a plausible, detailed, and verifiable account of his whereabouts on January 12th that did not include robbing a bank, and had identified and provided contact information in the form of a business card for a specific and apparently unrelated and unbiased alibi witness.  The agents knew that Plaintiff's alibi had not been checked out and might be verified or undermined by contacting or visiting his alibi witness.  The agents knew that it was approximately 3 p.m. when they made the determination to arrest Plaintiff, well before many businesses close for the day.

The agents knew that Plaintiff had failed the polygraph examination.  However, the agents also knew that Plaintiff had reported for the polygraph examination of his own volition as he had agreed to do, that he had brought his mother, father, and wife for support, and that he had provided

29

additional evidence to support his alibi.  The agents also would have known of the conduct of the examiner during the exam, including that Plaintiff was yelled at, told he was lying, and threatened with ending the examination, and that Plaintiff was generally nervous and kept asking them to verify his alibi.  Further, it is unclear from the record what questions were asked and which of Plaintiff's answers indicated deception and which, if any, did not.

Viewing only the incriminating evidence against Plaintiff, it would certainly be reasonable to conclude that there was a fair probability that Plaintiff committed the robbery.  However, viewing all of the facts and circumstances alleged to have been known to the officers at that time, this Court is not confident that a reasonable officer could have concluded that there was a fair probability that Plaintiff was guilty.  Certainly there was a possibility, but that is insufficient to support arrest.  The Court finds that there are genuine issues of material fact that might affect the outcome of the action. Consequently, the Court cannot find that Defendant is entitled to judgment as a matter of law on Plaintiff's claim of false arrest on January 15, 2010, and detention pursuant to such arrest.

## IV.    Detention Pursuant to Criminal Complaint Signed by Magistrate and Detention Order

From the evening of January 19 to January 22, 2010, there is no dispute that Plaintiff was detained pursuant to the criminal complaint and supporting affidavit signed by the Federal Magistrate Judge and her oral order of detention.  Because in most federal cases, officers are sued individually as *Bivens* defendants under federal constitutional law, and Texas does not waive its sovereign immunity for intentional torts of law enforcement officers under the Texas Tort Claims Act, there is little case law directly on point.  *See McElroy v. United States*, 861 F. Supp. 585, 594 fn 18 (W.D. Tex. 1994).

In reviewing a constitutional claim of false arrest or imprisonment under the Fourth Amendment, a warrant for search or detention may be found void where an affidavit contains a material misstatement or an omission of material fact made knowingly, intentionally, or with reckless disregard for the truth, and lacks probable cause once any erroneous statement is set aside and any omitted material fact considered. *See Franks*, 438 U.S. 154 at 155-56.

Significantly, under Texas law, it is a complete bar to a claim of false imprisonment that the detention was carried out under process legally sufficient in form and duly issued by a court or official with jurisdiction. *James v. Brown*, 637 S.W.2d 914, 918 (Tex. 1982); *Emerson v. Borland*, 927 S.W.2d 709, 720 (Tex. App.—Austin 1996, writ denied), cert denied, 522 U.S. 866, 118 S.Ct. 174 (1997) (finding false imprisonment claim based on officers' incorrect legal determinations precluded as a matter of law because warrants pursuant to which plaintiff was arrested had been issued by competent magistrates and were in proper form). Analogizing to an arrest warrant, the court must "not determine, for example, whether probable cause existed to issue the warrant.  If the warrant is valid on its face, [the court's] inquiry ends there.'" *LeBlanc v. Detective Riley*, No. 2-08-234-CV, 2009 WL 885953 *4 (Tex. App.—Ft. Worth 2009) (denying false imprisonment claim based on no probable cause to issue arrest warrant because the warrant was facially valid.).

The cases applying such absolute bar to a claim for false arrest or imprisonment typically involve arrest warrants and are brought against either: (1) an officer merely executing the warrant,[4] in which case the officer is entitled to rely on the facial validity of the warrant in its execution; or

---

[4]   *See e.g., McElroy v. United States*, 861 F.Supp. 585 (W.D. Tex. 1994) (innocent neighbors got caught up in officers' execution of valid search warrant; court entered judgment for Defendant finding officers had probable cause to detain plaintiffs until the officers could verify their non-involvement)

(2) an officer or citizen complainant requesting the warrant[5] but without any allegation that false or misleading factual allegations were provided or material facts were omitted from the affidavit supporting the warrant application.  Although Plaintiff does allege erroneous and misleading allegations were included in the affidavit and material facts were omitted, it appears he has no recourse under Texas's common law tort of false imprisonment.

### Detention Pursuant to Criminal Complaint filed January 19th

Plaintiff does not challenge the facial validity of the order of detention issued orally by the Magistrate Judge pursuant to the criminal complaint supported by Agent Cannella's affidavit which the judge signed the same day.  Plaintiff challenges the sufficiency and the veracity of the content of the affidavit, arguing that probable cause did not exist when the misstatements and misrepresentations are omitted and the omitted facts are included for consideration.  None of Plaintiff's disputed facts are relevant to the facial validity of the oral order to detain.  Under Texas law, the order of detention, valid on its face in form and entered by a court with jurisdiction over the matter, will generally bar Plaintiff from recovering on his tort claim for false imprisonment.

Regardless of whether the agents' actions constitute a tort, they do reveal the very real risk we all bear and the unfortunate consequences some experience of trying to balance society's

---

[5]    *See e.g., LeBlanc*, 2009 WL 885953 at *4; *Cantu v. Botello*, 910 S.W.2d 65, 66 (Tex. App.—Corpus Christi 1995, no writ.) (valid warrant barred claim of false arrest where officer obtained arrest warrant duly issued by a magistrate upon a showing of probable cause; plaintiff did not allege officer provided any false or misleading statements or omissions based upon his knowledge of the facts at the time he submitted the warrant application, but complained that the officer should've conducted investigation and discovered that the car involved, which had been owned by Plaintiff's father, had been sold months prior to the incident); *Martinez v. English*, 267 S.W.3d 521, 529 (Tex. App.—Austin 2008, pet. denied) (person arrested pursuant to valid arrest warrant based on complaint from unsatisfied customer given to law enforcement could not maintain claim for false imprisonment against customer.).

competing interests in effective law enforcement and protection of law-abiding citizens. "There is no constitutional guarantee that only the guilty will be arrested, to be sure." *Baker v. McCollan*, 443 U.S. 137 at 145, 99 S.Ct. 2689 (1979). However, any arrest or detention of an innocent individual is regrettable, especially one who is so cooperative.

## CONCLUSION

For the reasons stated above, the Court finds that the following **ORDERS** should be and are hereby entered:

(1)     Defendant's motion for summary judgment is **GRANTED** as to Plaintiff's warrantless arrest and detention on January 14th and his detention pursuant to the order of the Magistrate Judge from January 19th to January 22nd; and

(2)     Defendant's motion for summary judgment is **DENIED** as to Plaintiff's arrest on January 15th and his detention from that time until he was ordered detained by the Magistrate Judge at his initial appearance on January 19th.

**SIGNED and ENTERED on December 30, 2013.**

**ROBERT F. CASTANEDA**
**UNITED STATES MAGISTRATE JUDGE**