**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **ELIAS R. CAMACHO, JR.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-12-CV-40-RFC** |
| | § | |
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Defendant.** | § | |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**TO THE HONORABLE ROBERT F. CASTANEDA, U.S. MAGISTRATE JUDGE**

COMES NOW **Elias R. Camacho**, Plaintiff, and files the following Proposed Findings of Fact and Conclusions of Law.

## I.    Findings of Fact

1. On Tuesday, January 12, 2010 at approximately 11:22 a.m., the First Federal Bank on the west side of El Paso, Texas was robbed.[1] In the robbery, $1,833 were stolen.[2] The Federal Bureau of Investigation ("FBI") in El Paso, Texas investigated the First Federal Bank Robbery.[3]

2. Supervisory Special Agent Hector Camarillo ("SSA Camarillo") designated Special Agent Sharron Cannella ("SA Cannella") as lead agent in the investigation.[4]

---

[1] Federal Bureau of Investigation record of the robbery; s*ee also* Testimony of Sharron Cannella.
[2] Federal Bureau of Investigation record of the robbery.
[3] *Id*.
[4] Testimony of Hector Camarillo; Testimony of Sharron Cannella.

### A. Initial investigative procedures

3. SA Cannella interviewed Melissa Ramos, the teller involved in the robbery,[5] and Blanca Chavez, a bank employee who witnessed the robbery.[6] Both Ms. Ramos and Ms. Chavez provided a description of the robber.[7] Ms. Ramos described him as a man around his forties between 5'4" and 5'5" and 130 and 140 pounds.[8] Ms. Chavez described him as a man between 35 and 40 years old and 5'3" and 5'4" tall.[9]

4. An El Paso Police Department ("EPPD") officer distributed a Special Bulletin which contained some surveillance photos and the following description of the robber: Hispanic man in his late 30's between 5'3" and 5'5" with an average build.[10] The Special Bulletin described the vehicle used in the robbery as a four door, mid-sized car that had tinted windows and was light in color.[11]

5. The FBI and the EPPD released photos of the robber to the press.[12]

### B. The initial arrest of Mr. Camacho on Thursday, January 14, 2010

#### a. Wednesday, January 13, 2010

6. On Wednesday, January 13, 2010, Martha Valles contacted the FBI and stated that, "the individual [in the photographs] looked like Mr. Camacho."[13] According to SA Cannella, who interviewed Ms. Valles, Ms. Valles believed that the photograph "resembled Mr.

---

[5] Testimony of Sharron Cannella.
[6] Testimony of Sharron Cannella.
[7] Testimony of Sharron Cannella.
[8] 302 re: Melissa Ramos.
[9] 302 re: Blanca Chavez.
[10] Insert re: special bulletin; Special bulletin.
[11] *Id*.
[12] Probable cause statement.
[13] Testimony of Sharron Cannella.

Camacho and said that it looks just like him."[14] Ms. Valles also informed SA Cannella that she was best friends with Mr. Camacho's ex-girlfriend.[15]

7. SA Cannella asked Task Force Officer Arturo Ruiz ("TFO Ruiz") for his opinion on Mr. Camacho as a suspect for the robbery.[16] TFO Ruiz responded that his "big problem is the height and weight listed on the DL and [in the EPPD] records."[17] TFO Ruiz informed Cannella that records, most recent in 2007, reported Mr. Camacho as 5'6"- 5'9",185-220 pounds.[18]

8. SA Cannella also conducted surveillance on Mr. Camacho's home. At approximately 11:04 a.m., she, accompanied by SA Perez, conducted a "drive by" of the home.[19] The "drive by" was conducted to determine whether any vehicles around the home matched the description of the vehicle used in the robbery.[20] Neither of the vehicles in Mr. Camacho's driveway matched the vehicle description in the Special Bulletin.[21] SA Cannella later confirmed that, during her surveillance, she did not find any vehicle that matched the special bulletin's description.[22]

9. At approximately 5:44 p.m., SA Cannella conducted surveillance of Mr. Camacho's home, this time accompanied by SA Casey.[23] The vehicle in Mr. Camacho's driveway at

---

[14] Testimony of Sharron Cannella.
[15] 302 re: Martha Valles.
[16] Email from Cannella to Ruiz [1/13 @9:12 am]).
[17] Email chain between Cannella and Ruiz.
[18] Email from Ruiz to Cannella.
[19] Insert re: surveillance on Jan. 13, 2010.
[20] Testimony of Sharron Cannella.
[21] Special Bulletin; Insert re: surveillance on Jan. 13, 2010; *see also* Testimony of Sharron Cannella.
[22] Testimony of Sharron Cannella.
[23] Insert re: surveillance on Jan. 13, 2010.

this time did not match the vehicle description in the special bulletin either.[24] SA Cannella later confirmed that, during her surveillance, she did not find any vehicle that matched the description.[25]

10. Following the second "drive by", SA Cannella stationed herself outside of Mr. Camacho's home "for some period of time."[26] At this point, SA Cannella was no longer attempting to find a vehicle that matched the special bulletin's description, instead she was focused on observing Mr. Camacho.[27]

11. At approximately 6:04 p.m., SA Cannella conducted a ruse by knocking on Mr. Camacho's door and asking for "Sara."[28]  After viewing him in person, SA Cannella concluded that Mr. Camacho was the same person as the man appearing in the bank photos.[29]

### b.  Thursday, January 14, 2010

12. On January 14, 2010, the FBI conducted surveillance of Mr. Camacho, during which time he made two separate visits to the same Capital Bank branch in El Paso, making cash deposits of $111 and $100.[30]

13. Also on Thursday, January 14, 2010, FBI agents presented a photo lineup, which included Mr. Camacho's photo, to Melissa Ramos,[31] Blanca Chavez,[32] and a third bank

---

[24] Special Bulletin; Insert re: surveillance on Jan. 13, 2010; *see also* Testimony of Sharron Cannella.
[25] Testimony of Sharron Cannella.
[26] Testimony of Sharron Cannella.
[27] Testimony of Sharron Cannella.
[28] Insert re: surveillance on Jan. 13, 2010.
[29] Insert re: surveillance on Jan. 13, 2010.
[30] Testimony of Sharron Cannella.
[31] 302 re: Melissa Ramos photo lineup.
[32] 302 re: Blanca Chavez photo lineup.

employee.[33] The photo lineup contained six photos, including one of Mr. Camacho, and did not include any other identifying information, such as height and weight.[34]

14. Ms. Ramos selected Mr. Camacho's photo out of the lineup.[35] Ms. Chavez selected Mr. Camacho's photo out of the lineup "as the person who resembled the man who robbed" the bank.[36] She was, however, not 100% certain that Mr. Camacho was the robber and she rated her certainty as 8/10.[37] The third bank employee was unable to identify anyone as the robber because she had only gotten a glimpse of the man.[38]

15. SA Cannella's notes reflect that at 2:57 p.m., she called Assistant United States Attorney J. Brandy Gardes ("AUSA Gardes") and advised her of the results of the photo lineup, surveillance, and of the cash deposits.[39] AUSA Gardes approved a probable cause arrest of Mr. Camacho.[40]

16. At 3:02 p.m., SA Cannella sent the following text message to her supervisor, SSA Camarillo: "Call me, we got approval to arrest from Brandy, want to interview and arrest, want to make sure ur ok."[41] At 3:06 p.m., SA Cannella called SSA Camarillo and again informed him of AUSA Gardes's approval of a probable cause arrest of Mr. Camacho.[42] SSA Camarillo then gave his approval based on SA Cannella's description of the facts

---

[33] Testimony of Sharron Cannella.
[34] Photo lineup.
[35] 302 re: Melissa Ramos photo lineup.
[36] 302 re: Blanca Chavez's photo lineup.
[37] 302 re: Blanca Chavez's photo lineup.
[38] Testimony of Sharron Cannella.
[39] Sharron Cannella's telephonic communications.
[40] *Id*.
[41] *Id*.
[42] *Id*.

and AUSA Gardes's previous approval.[43] SSA Camarillo did not make an independent review of the reasons for arrest given by SA Cannella.[44]

17. Around 3:00 p.m., Mr. Camacho was at a Whataburger drive-thru with his wife.[45] Suddenly, individuals with guns and badges began screaming at Mr. Camacho and his wife.[46] The individuals informed Mr. Camacho and his wife that they were the police and demanded that the Camachos put their hands through the car windows.[47] Mr. Camacho was "shocked, scared[,] and completely confused."[48] Officers pulled Mr. and Mrs. Camacho out of the car.[49] Mr. Camacho was panicked and confused.[50] He asked officers "Why, why, why was this happening?"[51] Officers provided no explanation and placed him in handcuffs.[52]

18. The officers placed Mr. Camacho in the back of an SUV and sped to his home ignoring Mr. Camacho's urgent pleas for an explanation as to why he was being arrested.[53]  Mr. Camacho readily consented to a search of his vehicle and home.[54]

19. At this point, Mr. Camacho saw his wife arrive at their home surrounded by agents.[55] He again asked officers why he was being arrested.[56] Officers responded that the case agent

---

[43] Testimony of Hector Camarillo.
[44] Testimony of Hector Camarillo.
[45] Testimony of Elias Camacho.
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] Testimony of Elias Camacho.
[54] Testimony of Sharron Cannella.
[55] Testimony of Elias Camacho.
[56] *Id.*

would tell him when she arrived.[57] Agent Cannella, the case agent, arrived but did not respond to Mr. Camacho's questions.[58] She did not tell him why he had been arrested.[59]

20. Mr. Camacho was then taken to the Pebble Hills Regional Command Center and detained in a cell.[60] He still had no idea why he had been arrested.[61]

### C.  The investigative activities after the initial arrest of Mr. Camacho

#### a.  The search of Mr. Camacho's vehicle and home

21. At approximately 3:25 p.m. on Thursday, January 14, 2010, SA Tidwell searched Mr. Camacho's vehicle and located two bank deposit slips to a Capital Bank account in the amounts of $100 and $111.[62]

22. Agents also performed a search of Mr. Camacho's home.[63] During that search, a copy of a check made out to Gustavo Espinoza for $1622 was recovered.[64]   This amount, combined with the two deposits Mr. Camacho had made to an account at Capital Bank ($211) equaled the amount stolen in the bank robbery --$1,833.

#### b.  Investigation that occurred at the home of Mr. Camacho's father

23. At approximately 5:00 p.m. on Thursday, January 14, 2010, agents went to Mr. Camacho's father's house, showed him two of the bank surveillance photos and asked if the person in the photo was Mr. Camacho.[65] He told the agents that while there was some resemblance, it was not his son.  He told them that he had seen his son earlier that day

---

[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] *See* Testimony of Elias Camacho.
[62] Tidwell's notes on vehicle search.
[63] Insert re: search of home.
[64] *Id.*
[65] Testimony of Elias Camacho, Sr..

because he had asked him to stop by and pick up both a copy of a check for $1,622 that needed to be returned to Copart Salvage Yard and the $100 that he owed his son for helping to return a stolen vehicle to the United States.

24. Mr. Camacho's father explained that he works with Copart and Gustavo Espinoza to retrieve stolen vehicles from Mexico and that the wrecker accidently gave Espinoza the carbon copy when he delivered the original check to Espinoza; Espinoza gave the check to Mr. Camacho, Sr. to return to Copart for their records; and Mr. Camacho, Sr. asked his son to return it to Copart for him.  The agents declined to ask Mr. Camacho, Sr. more questions regarding the carbon copy of the check.[66] Had agents pursued this line of questioning, Mr. Camacho, Sr. would have provided them with a copy of an email which showed the origins of the check.[67]

25. When Mr. Camacho's brother, Marco Camacho, a long-time United States Border Patrol Agent arrived at their father's house, the agents showed him some photos from the bank surveillance and asked if the man in the photos was Mr. Camacho.[68] Marco told officers he "did not think the individual was [his] brother."[69] While the man in the photos looked somewhat similar to Plaintiff, he pointed out specific details that made Marco believe it was not Mr. Camacho, including the fact that Mr. Camacho does not wear beanies nor the type of glasses worn by the man in the pictures. [70] Marco at no time identified the man in the photos as his brother.

---

[66] *Id*.
[67] *Id*.; *see also* Testimony of Elias Camacho, Sr.
[68] *Id*.
[69] *Id.*
[70] *Id*.

### c.  The interview

26. While his home was being searched and his family was being interviewed, Mr. Camacho was interviewed after his arrest by SA Cannella, SA Hughes, and TFO Ruiz at the Pebble Hills Regional Command Center.[71]

27. During the interview, Mr. Camacho continually asserted his innocence.[72] He told agents that he was on the east side of El Paso at a company named, Therm-O-Link, during the morning of Tuesday, January 12, 2010 to visit Amy Ramirez, a customer.[73] He explained to agents that he spoke to Ms. Ramirez about office products and even identified the specific products she requested.[74] He told SA Cannella about a power outage that occurred while he was at the business.[75] He also informed SA Cannella of another interaction he had with a Therm-O-Link employee regarding the purchase of a special type of tape.[76] In his interview on Thursday, January 14, 2010, Mr. Camacho provided SA Cannella with a detailed account of his actions on the morning of Tuesday, January 12, 2010.[77]

28. He also explained about the origins of the carbon copy of the check found in his home.[78] His explanation was corroborated by the one given by his father to another agent around the same time.[79]

---

[71] 302 re: Elias Camacho interview.
[72] Cannella's notes on Camacho's interview.
[73] Cannella's notes on Camacho's interview.
[74] *Id*.
[75] *Id*.
[76] *Id*.
[77] *Id*.
[78] Cannella's notes on Camacho's interview.
[79] *Id*.; Testimony of Elias Camacho, Sr.

29. At 5:37 p.m., after Mr. Camacho's interview, SA Cannella sent the following text to SSA Camarillo: "Feeling iffy, going 2 try & set up poly, may release &[]have show up tomorrow & if doesn't, get warrant if kent can't do it now, kent calling polly buddy to consult[.]"[80]

30. At approximately 5:42 p.m., the agents released Mr. Camacho from custody[81] after he agreed to return for a polygraph examination the next morning at 10:00am.[82]  If Mr. Camacho did not return in the morning to take the polygraph test, SA Cannella planned to have a warrant issued for Mr. Camacho's arrest.

**Friday, January 15, 2010**

     **d.  The polygraph**

31. On Friday, January 15, 2010 at approximately 9:00 a.m., Mr. Camacho reported to El Paso FBI Headquarters for a polygraph examination.[83] He was accompanied by his mother, father, and wife.[84] Upon his arrival, he handed SA Switzer the receipt for his lunch with his wife on January 12th and the Therm-O-Link business card for Amy Ramirez, with whom he had met the morning of January 12th. [85]  Mr. Camacho was escorted by SA Switzer from the lobby to the polygraph room.[86]

32. As of the morning of Friday, January 15, 2010, agents were in possession of Amy Ramirez's business card,[87] which contained several ways of contacting her.[88]

---

[80] Sharron Cannella's telephonic communications.
[81] *Id*.
[82] 302 re: Camacho's interview; see also Testimony of Sharron Cannella.
[83] Testimony of Elias Camacho; Sharron Cannella's telephonic communications.
[84] Testimony of Elias Camacho.
[85] Testimony of Elias Camacho; Testimony of Kent Switzer; Testimony of Elias Camacho, Sr.
[86] Testimony of Elias Camacho; Testimony of Cannella; Testimony of Kent Switzer.
[87] Testimony of Elias Camacho; Testimony of Sharron Cannella.
[88] Testimony of Amy Ramirez.

Specifically, it had her business phone, email, and address.[89] SA Cannella had access to all of this information in the morning of Friday, January 15, 2010.[90]

33. After Mr. Camacho was escorted away by SA Kent Switzer, his father spoke with SSA Camarillo.[91] They recognized each other from when they worked together at the El Paso Police Department ("EPPD").[92] SSA Camarillo told him "'not to worry' and that he had seen the photo and knew it was 'not him.'"[93] Further, SSA Camarillo told Elias Camacho, Sr. that Mr. Camacho would be released after the polygraph examination.[94] Elias Camacho, Sr. mentioned Mr. Camacho's alibi to SSA Camarillo and was led to believe "that the agents were already checking it out that day."[95]

34. Mr. Camacho was very nervous about the polygraph examination.[96] He was afraid the test would show he had robbed the bank when he had not.[97] The examination was "chaotic and nerve wracking."[98] SA Switzer yelled at Mr. Camacho, told him he was lying, and threatened to end the exam.[99] SA Switzer told Mr. Camacho he had failed the exam.[100]

---

[89] *Id.*
[90] Testimony of Sharron Cannella.
[91] Testimony of Elias Camacho, Sr..
[92] *Id.*
[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] Testimony of Elias Camacho.
[97] *Id.*
[98] *Id.*
[99] *Id.*
[100] *Id*; Polygraph report.

35. The polygraph score sheet and report have been redacted.[101] Neither provides any indication of which of Mr. Camacho's answers indicated deception.[102] The polygraph examiner was also unable to provide the answers which indicated deception.[103]

36. After being told he had not passed the exam, Mr. Camacho continued to assert his innocence.[104] Mr. Camacho asked agents to call Therm-O-Link.[105] He again explained in great detail where he was on the morning of Tuesday, January 12, 2010 and why he could not have robbed the bank.[106] Mr. Camacho even agreed to write a signed statement.[107]

### e.   The statement

37. On Friday, January 15, 2010, Mr. Camacho wrote a signed statement that was witnessed and signed by SA Cannella and SA Switzer.[108]

38. In his statement, Mr. Camacho again provides a very detailed account of his activities on Tuesday, January 12, 2010.[109] Specifically, Mr. Camacho said that between 10:30 a.m. and 10:45 a.m. he arrived at Therm-O-Link.[110]

39. Therm-O-Link is located on the east side of El Paso at 1295 Henry Brennan.[111] Therm-O-Link is 23.1 miles from First Federal Bank.[112] Driving from Therm-O-Link to First Federal Bank with no traffic delays would take approximately 26 minutes.[113]

---

[101] Polygraph report.; see also polygraph score sheet.
[102] Polygraph report.; see also polygraph score sheet.
[103] Testimony of Kent Switzer.
[104] Testimony of Kent Switzer; Testimony of Elias Camacho.
[105] Testimony of Elias Camacho
[106] *Id.*
[107] *Id.* at 5; Testimony of Kent Switzer; Polygraph report.
[108] Camacho's signed statement.
[109] *Id.*
[110] *Id.*.
[111] *Id.*
[112] Google Maps.
[113] Google Maps.

40. In his statement, Mr. Camacho also said he was going to Therm-O-Link in his professional capacity as an Indoff salesman to establish a sales account with them.[114] There he met the Administrative Assistant, Amy Ramirez.[115] Ms. Ramirez is in charge of purchasing items for Therm-O-Link.[116] He and Ms. Ramirez discussed the purchase of a trash-can and flat back tape.[117] While he was at Therm-O-Link, a male supervisor also discussed flat back tape with him and provided a sample of the tape.[118] Mr. Camacho and the male supervisor discussed getting Therm-O-Link a better price for the tape.[119]

41. Mr. Camacho further wrote that while he was at Therm-O-Link, "the lights flickered on and off and then the warehouse power went out."[120] Ms. Ramirez explained to Mr. Camacho that a long process was required to restart the machines.[121] Understanding that Ms. Ramirez was busy, Mr. Camacho told her he would provide her a quote, said goodbye, and left.[122] Mr. Camacho estimated he was at Therm-O-Link for approximately 15-20 minutes.[123]  All of these details are included in this statement.

42. Assuming that Mr. Camacho was at Therm-O-Link for only 15 minutes, he would have left the business at 11:00 a.m.[124] If there had been no traffic delays on the freeway at that

---

[114] Camacho's signed statement.
[115] *Id.*
[116] *Id.*
[117] *Id.*
[118] *Id.*
[119] *Id.*
[120] *Id.*
[121] *Id.*
[122] *Id.*
[123] *Id.*
[124] Camacho's signed statement.

time, the earliest Mr. Camacho could have reasonably arrived at First Federal Bank was at 11:26 am.[125] The robbery of First Federal Bank took place at 11:22 am.[126]

43. Mr. Camacho continued to detail in his written statement his activities on Tuesday, January, 12, 2010.[127] He arrived home at some point between 11:15 and 11:20 am.[128] He logged on to a secure web page which required him to submit three passwords.[129] He sent Ms. Ramirez a quote on two different trash cans.[130] He also "put in a blog" to request the help of other Indoff partners in locating the flat back tape.[131] He and his wife then went to have a sit down lunch at a restaurant, which they left around 1:30 pm.[132]

**D.  The second arrest of Mr. Camacho on Friday, January 15, 2010**

44. On Friday, January 15, 2010 at 11:49 am, SA Cannella discussed the result of Mr. Camacho's polygraph with SSA Camarillo.[133] SSA Camarillo requested that SA Cannella call AUSA Gardes for "concurrence with a probable cause arrest."[134] SSA Camarillo did not speak with SA Switzer about the results of the polygraph or about which of Mr. Camacho's answers indicated deception.[135] SSA Camarillo has no recollection of being briefed on Camacho's easily verifiable alibi at this time.[136]

---

[125] Camacho's signed statement; Google Maps.
[126] Federal Bureau of Investigation record of the robbery, Jan. 12, 2010.
[127] Camacho's signed statement.
[128] *Id.*
[129] *Id.*
[130] *Id.*
[131] *Id.*
[132] *Id.*
[133] Sharron Cannella's telephonic communications.
[134] *Id.*
[135] Testimony of Camarillo.
[136] Testimony of Camarillo.

45. At 11:52 am, SA Cannella discussed the results of the interviews on Thursday, January 14, 2010 and the polygraph examination with AUSA Gardes.[137]

46. SA Cannella further misrepresented material pieces of evidence to AUSA Gardes at this time.[138] Specifically, she did not describe the carbon copy of the check and instead called it a "financial transaction."[139] She also represented to AUSA Gardes that a family member, specifically Marco Camacho, had identified Mr. Camacho as the robber.[140] Further, AUSA Gardes has no recollection of being briefed on Camacho's easily verifiable alibi at this time.[141]

47. AUSA Gardes approved a probable cause arrest[142] and Mr. Camacho was arrested for a second time on Friday, January 15, 2010 at 3:01 pm.[143] He was then transported to the El Paso County Detention Facility.[144]

   a. **Tuesday, January 19, 2010**

48. Agent Cannella sent a draft of the criminal complaint against Mr. Camacho to AUSA Gardes at 6:11am on Tuesday, January 19, 2010.  She sent her a shorter version of the complaint at 8:33am, received approval for the complaint from AUSA Gardes at 9:01am, and received a request from AUSA Gardes for a motion to detain at 9:14am.

49. SA Cannella's affidavit in support of the complaint alleged several facts supporting probable cause to arrest Mr. Camacho, including: (1)photos of the robber were released on January 12, 2010; (2) a person, stating she was a friend of Mr. Camacho's called in

---

[137] Sharron Cannella's telephonic communications.
[138] Testimony of Gardes.
[139] Testimony of Gardes.
[140] Testimony of Gardes.
[141] Testimony of Gardes.
[142] Sharron Cannella's telephonic communications.
[143] Arrest Supplement.
[144] Sharron Cannella's telephonic communications.

and said the picture looked just like Mr. Camacho; (3) on Thursday, two tellers involved in the robbery identified Mr. Camacho out of a photo spread; (4) SA Cannella went to Mr. Camacho's house on January 13 and after seeing him, concluded that he was the same person depicted in the robbery photos; (5) a search of Mr. Camacho's residence revealed a bank transaction receipt for an amount which combined with his two deposits equaled the amount stolen; and (6) subsequent to his arrest, Mr. Camacho's brother identified Mr. Camacho as the person in the bank surveillance photos.[145]

50. SA Cannella misrepresented several pieces of evidence in her probable cause affidavit.[146]

51. First, she described the carbon copy of the check as a "bank transaction receipt" rather than as a copy of a check.[147] The probable cause affidavit makes no mention of Mr. Camacho's explanation for the check or of Mr.Camacho's father's detailed explanation of the origin of the check.[148]

52. Second, SA Cannella states the following: "Subsequent to the arrest of Camacho, Camacho's brother identified the bank robber in the bank surveillance photographs as his brother Elias Camacho, Jr."[149] Marco Camacho never identified the man in the surveillance photos as his brother.[150] Instead, he pointed to specific details which made it clear that Mr. Camacho was not the man in the photos.[151] Finally, SA Cannella's probable cause statement makes no mention of Mr. Camacho's easily verifiable alibi.[152]

---

[145] *Id.*
[146] Probable Cause affidavit; Testimony of Elias Camacho; Testimony of Marco Camacho.
[147] Probable cause affidavit.
[148] Probable cause affidavit.
[149] Probable cause affidavit.
[150] Testimony of Marco Camacho.
[151] *Id.*
[152] Probable Cause Statement.

53. On Tuesday, January 19, 2010 the criminal complaint was signed by a United States Magistrate Judge Margaret Leachman, and Plaintiff was orally ordered detained during his initial appearance.[153]

   **b. The alibi investigation**

54. On Thursday, January 14, 2010, SA Cannella was aware that Mr. Camacho had met with Ms. Ramirez at Therm-O-Link on the east side of El Paso on the day of the robbery.[154]

55. On Friday January 15, 2010 SA Cannella did not dial the number on the business card.[155] Nor did any agent.[156] Further, no FBI agent attempted to contact Therm-O-Link.[157]

56. On Saturday, January 16, 2010 SA Cannella determined that because of the number of people in El Paso named Amy Ramirez, it would be too difficult to locate Ms. Ramirez over the weekend.[158] Because Monday was Martin Luther King, Jr. Day SA Cannella determined it would also be too difficult to attempt to contact Ms. Ramirez.[159]

57. There was no documented attempt to contact Ms. Ramirez on Sunday, January 17, 2010.[160]

58. There was no documented attempt to contact Ms. Ramirez on Monday, January 18, 2010.[161]

59. The FBI made no attempt to contact Therm-O-Link from Friday, January 15, 2010 to Monday, January 18, 2010, despite the fact that Therm-O-Link is open 24 hours a day

---

[153] Complaint.
[154] Testimony of Sharron Cannella.
[155] Cannella Communication log; Testimony of Amy Ramirez.
[156] Testimony of Amy Ramirez.
[157] Testimony of Amy Ramirez.
[158] Cannella's Declaration.
[159] *Id.*
[160] Insert re: contacting Ramirez.
[161] Insert re: contacting Ramirez.

and 7 days a week.[162] Further, at no point in this time period did any agent simply dial the number on Amy Ramirez's business card.[163]

60. On Tuesday, January 19, 2010 agents interviewed Amy Ramirez at Therm-O-Link.[164] She informed agents that on Tuesday, January 12, 2010 Mr. Camacho was at Therm-O-Link at some point between 10:00 am and 11:30 am for approximately half an hour.[165] She also told agents that while Mr. Camacho was at the business, Therm-O-Link suffered a power outage.[166] Corroborating Mr. Camacho's previous statement to agents.[167] Although Ms. Ramirez was unable to determine the exact time of Mr. Camacho's visit, she was able to tell SA Cannella that Mr. Camacho emailed her at 12:10 pm about their meeting that morning.[168] Once again corroborating Mr. Camacho's statements.[169]

61. Further, Octavio Amaro, another Therm-O-Link employee, confirmed that on Tuesday, January 12, 2010 Ms. Ramirez spoke with a salesman for around half an hour and was present during the outage.[170] He placed Mr. Camacho at Therm-O-Link at some point between 10:00 am and 11:00 am.[171]

62. Approximately fifteen minutes after agents left Them-O-Link, Ms. Ramirez called SA Cannella.[172] Ramirez told Cannella that another employee had documented that the power went out at 11:16 am and that Mr. Camacho was at the business from 11:16 am through

---

[162] Testimony of Amy Ramirez.
[163] *Id*; Insert re: contacting Ramirez.
[164] 302 re: Amy Ramirez.
[165] *Id*.
[166] *Id*..
[167] Camacho's signed statement.
[168] 302 re: Amy Ramirez.
[169] Camacho's signed statement.
[170] 302 re: Octavio Amaro.
[171] *Id*.
[172] 302 re: Amy Ramirez.

11:30 am.[173] SA Cannella did not return to Therm-O-Link on Tuesday, January 18, 2010 to re-interview Ms. Ramirez.[174]

63. On Tuesday, January 19, 2010 at 1:20 pm, SA Cannella left a voicemail for AUSA Gardes to advise her of the results of the interview with Amy Ramirez.[175]

64. On Wednesday, January 20, 2010, agents returned to Therm-O-Link and re-interviewed Ms. Ramirez.[176] She informed agents that another employee had documented the power outage.[177] Agents interviewed this employee, Alex Bustamante.[178] On January 12, 2010, Mr. Bustamante noted that the power spike had been at 11:16 am.[179] Further, Bustamante confirmed that Mr. Camacho was at Therm-O-Link at this time.[180]

65. At 7:15 pm, SA Cannella spoke with AUSA Gardes about the results of both interviews with Ms. Ramirez.[181] SA Cannella agreed to update AUSA Gardes on the results of additional interviews.[182] At this point, Cannella also asked that Mr. Camacho be released.[183]

### c.  Mr. Camacho's release

66. On Thursday, January 21, 2010, an order of dismissal was submitted to the Clerk's office.[184]

---

[173] *Id.*
[174] Cannella's declaration.
[175] Sharron Cannella's telephonic communications.
[176] *Id.*
[177] *Id.*
[178] 302 re: Alex Bustamante.
[179] *Id.*
[180] *Id.*
[181] Sharron Cannella's telephonic communications.
[182] *Id.*
[183] Testimony of Sharron Cannella.
[184] Order of Dismissal.

67. Mr. Camacho was released from jail on Friday, January 22, 2010.[185] He was incarcerated for six days and seven nights.[186]

**E.  Mr. Camacho's damages as a result of his arrest**

68. Mr. Camacho lost his sales job at Indoff because of his false arrest.[187] Specifically, the company cited his poor character when he was fired.[188]

69. Mr. Camacho also lost a significant amount of his business as a "sobador."[189] A "sobado" is "an old Aztec Hispanic way of rubbing an injury."[190]

70. Further, he has also lost employment through Copart.[191] Following Mr. Camacho's arrest his father's business declined due to the false arrest.[192]

71. Mr. Camacho lost his home.[193] He was unable to pay his rent due to his loss of employment.[194] Further, the embarrassment of being arrested also affected his decision to leave his home.[195]

72. Mr. Camacho has lost his sense of security.[196] He is paranoid and afraid.[197] He is unable to go to his brother's home after it was searched by the FBI.[198]

73. Mr. Camacho has had trouble sleeping since the false arrest.[199] Several times a week he will awaken in the middle of the night panicked.[200]

---

[185] Testimony of Elias Camacho.
[186] *Id.*
[187] Testimony of Elias Camacho.
[188] Testimony of Elias Camacho.
[189] Testimony of Elias Camacho.
[190] Testimony of Elias Camacho.
[191] Testimony of Elias Camacho.
[192] Testimony of Elias Camacho.
[193] Testimony of Elias Camacho.
[194] Testimony of Elias Camacho.
[195] *Id.*
[196] Testimony of Elias Camacho.
[197] *Id.*
[198] Testimony of Elias Camacho.

## II.      Conclusions of Law[201]

1. Pursuant to the Federal Torts Claims Act (FTCA), the United States can be held liable in tort in the same manner that a private individual would be liable under similar circumstances under the law of the place where the act occurred. 28 U.S.C. § 2671; 28 U.S.C. § 1346(b)(1).

2. In the state of Texas, liability is imposed on private individuals for both false arrest and false imprisonment. *See Miller v. Baylor Coll. of Med. Fed. Credit Union*, CIV. A. H-09-1332, 2011 WL 677350, at *4 (S.D. Tex. Feb. 16, 2011). Both claims share the following elements: (1) a willful detention of the plaintiff; (2) without the plaintiff's consent; (3) without authority of law. *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002).

3. The willful detention of Plaintiff without his consent is not at issue in this case. Order Granting Part Denying Part Def.'s Mot. Sum. J. 12, Dec. 30, 2013, ECF No. 45. The only contested element in this case is lack of legal authority. *Id.*

4. A law enforcement officer has the legal authority to make a warrantless arrest only when there are "reasonable grounds to believe that the person to be arrested has committed" a felony. 28 U.S.C. § 3052. The probable cause standard generally required for warrantless arrests is equivalent to § 3052's "reasonable grounds" requirement. *See United States v. Campbell*, 575 F.2d 505, 507 (5th Cir. 1978). For this reason, the existence of probable cause is a complete defense to any claim for false arrest or imprisonment based on a

---

[199] Testimony of Elias Camacho.
[200] Testimony of Elias Camacho.
[201] The Court has fully set out the applicable law in detail in its Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment.  [Doc. 45].  Rather than reiterate its earlier analysis, the Court incorporates those findings into this Findings of Fact and Conclusions of Law and provides only a summary of the applicable law.

warrantless arrest. *See Nunez v. Jiminez*, No. 04-07-403-CV, 2007 EL 4320822, at *3 (Tex. App.—San Antonio, Dec. 12, 2007, no pet.).

**a.   The probable cause standard**

5.   Whether probable cause exists, is determined based on the totality of facts and circumstances within the officer's knowledge at the time of arrest. *Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2000). For this reasons, a suspect's innocence does not, in itself, cancel probable cause or render law enforcement's actions without authority. *Pierson v. Ray*, 386 U.S. 547, 555 (1967).

6.   The Supreme Court has defined probable cause to justify an arrest as the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown that the suspect has committed" a felony. *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).

7.   The Fifth Circuit has further defined the probable cause inquiry to require that an officer reasonably and honestly believed facts which would cause a prudent person to believe there is a fair probability that the suspect committed a crime. *Gordy*, 294 F.3d at 729.

8.   The fact that there is exculpatory evidence that may suggest the suspect is not guilty does not, on its own, undermine the existence of probable cause. *Gordy*, F.3d at 729. However, exculpatory evidence is part of the totality of facts and circumstances that must be considered when making a probable cause analysis and cannot be ignored. *Evett v. DETNTFF*, 330 F.3d 681, 688 (5th Cir. 2003).

**1)   Eyewitness identification**

9.   Although eyewitness identification can help establish probable cause, it does not overcome the required consideration of the totality of the circumstances when there may

be a reason to doubt the identification. *United States v. Burbridge*, 252 F.3d 775, 558 (5th Cir. 2001) (eyewitness identification is generally sufficient); *See McBride v. Crime Stoppers*, 1994 WL 684541, at *4 (5th Cir. 1994) (unpublished) (considered the totality of circumstances when eye witness identification was called into doubt by discrepancies between identification and original description).

### 2) Failure to investigate

10. When an investigative detention occurs, officers must "diligently pursue[] a means of investigation that [is] likely to confirm or dispel their suspicions quickly[.]" *Short v. West*, 662 F.3d 320, 327 (5th Cir. 2011).

11. The Fifth Circuit, however, has not recognized a general independent duty for law enforcement officers to conduct a reasonable investigation of the available evidence before making an arrest once the totality of the circumstances would support finding probable cause.  An officer's failure to investigate further before making an arrest, therefore, is actionable only insofar as it may negate the existence of probable cause. *Rakun v. Kendall County*, 2007 WL 2815571, at *48 (W.D. Tex. 2007) (unpublished), citing *Kuehl v. Burtin*, 173 F.3d 646, 650-651 (8th Cir. 1999)(explaining an officer's duty to investigate before arrest) and *Gaines v. Asaro*, 246 Fed.Appx. 244, 246, 2007 WL 2007545 **2(5th Cir. 2007)(finding 5th Circuit not bound by decisions of other circuits recognizing a general duty to investigate).

### 3) Full and fair disclosure

12. A probable cause determination must be based on the totality of the circumstances. *Resendiz v. Miller*, 203 F.3d at 903. When an agent seeks a probable cause determination, the totality of the circumstances are subject to full and fair disclosure. *See Chandler v.*

*United States*, 875 F. Supp. 1250, 1269 (N.D. Tex. 1994) ("A person causing a criminal complaint to be filed does so on probable cause where he makes a full and fair disclosure of the facts and circumstances known to him[.]"). Further, an agent must disclose not only information that tends to establish probable cause but also exonerating information. *Id*. Finally, "[i]f the reporting party does not in good faith disclose all material facts known to him, probable cause does not exist." *Id*.

13. The failure to disclose exonerating information requires the court to consider whether probable cause existed when considering the totality of the circumstances, including any information that was originally misrepresented or withheld. *See Rios v. State*, 376 S.W.3d 238, 241-242 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (Where the court considered whether probable cause existed after deleting a misleading statement).

**b.  Probable cause to arrest on Friday, January 15, 2010[202]**

14. There are three facts, disputed at trial, that are relevant to the totality of the circumstances at the time of Plaintiff's arrest that undermine a finding of probable cause.  They include: (1) that Marco Camacho did not identify his brother, Plaintiff as the person in the bank photos; (2) SA Cannella misrepresented the copy of the Copart check made out to Mr. Espinoza and (3) SA Cannella neglected to communicate Plaintiff's easily verifiable and detailed alibi information to the AUSA.  The Court finds that Plaintiff has established each of these facts by a preponderance of the evidence.

15. Given these factual findings, the following is a summary of all the facts known to the agents at the time of Plaintiff's arrest on the 15th: (1) a tip had been received that the

---

[202] The Court has previously ruled that the government had sufficient probable cause to arrest Mr. Camacho on January 14, 2010.  *See*, Order Granting in Part Defendant's Motion for Summary Judgment.  [Doc. 45].  For this reason, the Court will only consider Mr. Camacho's second arrest on January 15, 2010.

assailant looked like the Plaintiff; (2) Plaintiff had been identified in a photo array by two bank tellers, one of whom had only an 8/10 certainty; and the other who had previously described the assailant as shorter and lighter than the officers knew Plaintiff's records to show; (3) Plaintiff's father, a former police officer, and brother, a current border patrol agent, agreed that Plaintiff looked similar to the assailant in the bank photos, but disagreed that it was Plaintiff; his brother provided some specific reasons why the person in the bank photo was not Plaintiff; (4) SA Camarillo did not think that Plaintiff was the person in the bank photos; (5) while agents knew that Plaintiff had made two bank deposits and had a copy of a check in his possession that suspiciously totaled the amount stolen from the bank, the agents had also obtained consistent plausible innocent explanations from both Plaintiff and Plaintiff's father (and verifiable by at least two other sources) regarding the significance of the check and why it was in Plaintiff's possession; (5) Plaintiff had given the agents a plausible, highly detailed, verifiable account of his whereabouts on January 12th and had identified and provided contact information in the form of a business card for a specific, unrelated and unbiased alibi witness (The agents knew that Plaintiff's alibi had not been checked out and might be verified by contacting or visiting his abili witness.); (6) that Plaintiff had failed the polygraph examination; however, the agents also knew that appeared for the polygraph on his own volition and he had brought several family members for support, as well as additional evidence to support his alibi (The agents also knew of the conduct of the examiner during the exam, including that Plaintiff was yelled at, told he was lying and threatened with ending the exam.).

16. After reviewing all of the facts and circumstances known to the agents at the time of Mr. Camacho's arrest on January 15th, this Court concludes that Plaintiff has shown by a preponderance of the evidence that a reasonable officer could doubt that there was a fair probability that Plaintiff was guilty of robbing the First Federal Bank in El Paso on the morning of January 12, 2010.

17. The alibi information provided by Plaintiff, the true nature of the Copart check, and Marco Camacho's actual response to the FBI's questions were material facts known to SA Cannella at the time of Plaintiff's arrest on Friday, January 15, 2010.

18. SA Cannella failed to disclose the alibi information and misrepresented both the Copart check and Marco Comacho's statements. Further, the failure to investigate easily verifiable alibi information works to negate probable cause.

19. Based on the totality of the circumstances known to SA Cannella, a reasonably prudent officer would not have believed that there was a fair probability that Plaintiff committed the bank robbery.

20. For this reason, Plaintiff has established that probable cause for his arrest on Friday, January 15, 2010 was lacking. Without probable cause, there was no legal authority for Plaintiff's arrest and detention. The Court finds that Plaintiff has established by a preponderance of the evidence that he was falsely arrested and detained under Texas law.

21. The Court has previously found that since Plaintiff was detained from the evening of January 19th through January 22nd pursuant to the criminal complaint and supporting affidavit signed by the U.S. Magistrate Judge and her oral order of detention, Texas tort law bars recovery for this period of time. *See*, Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment, [Doc. 45], p. 30-32. However, upon

reconsideration and its findings that SA Cannella misrepresented material facts in her probable cause affidavit, the Court finds that the state of the law is not clear in these circumstances, and, for this reason, the complaint signed by the U.S. Magistrate does not act as a bar to recovery for this period of time.[203]

Respectfully submitted,

**DOMINGUEZ & COYLE, P.L.LC.**
2515 North Stanton Street
El Paso, Texas 79902
(915) 532-5544
(915) 532-5566 Facsimile

BY:   /s/ *Lynn Coyle*
**LYNN COYLE**
Texas Bar No. 24050049
**CHRISTOPHER C. BENOIT**
Texas Bar No. 24068653

AND

**ENRIQUE MORENO**
State Bar No. 14430500
**LAW OFFICES OF ENRIQUE MORENO**
701  Magoffin Avenue
El Paso, Texas 79901
(915) 533-9977
(915) 533-0033 Facsimile

**ATTORNEYS FOR PLAINTIFF**

---

[203] Plaintiff respectfully proposes this conclusion of law notwithstanding the Court's prior ruling in order to: (1) be be provided an opportunity to argue this point of law at the pre-trial scheduled in this matter; and/or (2) preserve this issue in the event there is an appeal.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 25, 2014 I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.


/s/ *Lynn Coyle*
**LYNN COYLE**