**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| | § | |
| **ELIAS R. CAMACHO, JR.,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-12-CV-40-RFC** |
| | § | |
| **UNITED STATES OF AMERICA,** | § | |
| **Defendant.** | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On this day, the Court considered the testimony and evidence presented by Plaintiff Elias R. Camacho Jr. and Defendant United States of America at a trial conducted before the Court from September 15, 2014 to September 18, 2014, in the above-captioned cause. The issue before the Court at trial was Plaintiff's claim for false arrest and imprisonment pursuant to the Federal Tort Claims Act ("FTCA"). After careful consideration of the testimony and evidence, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[1]

**Findings of Fact**

**A.      Tuesday, January 12, 2010**

1.      On Tuesday, January 12, 2010, at approximately 10:45 a.m., a robber entered the First Federal Bank ("the bank") on the west side of El Paso, Texas, walked around the lobby, and

---

[1] Any findings of fact more properly characterized as a conclusion of law shall be adopted as such, and any conclusion of law more properly characterized as a finding of fact shall be adopted as such.

then walked out.  2R78, 87; JX1; PX12.[2]  He entered the bank again at approximately 11:15 a.m., walked up to a teller station, stated he forgot his identification, and left again.  2R48, 74-75; 3R121-124; PX10-11.  He then returned a few minutes later, went up to the same teller station with a withdrawal slip, and robbed the bank at approximately 11:22 a.m.  2R18-19; JX3; PX10-11.  In the robbery, $1,833 were stolen.  JX15:2; PX10:3.  The Federal Bureau of Investigation's ("FBI") Violent Crimes Task Force in El Paso, Texas investigated the First Federal Bank Robbery.  1R26-30.  FBI Special Agent Sharon Cannella ("SA Cannella") was assigned to be the lead agent[3] for the robbery investigation.  1R30, 1R286-287, 295.

2.      SA Cannella interviewed Melissa Ramos ("Ramos"), the teller involved in the robbery, and Blanca Chavez ("Chavez"), a bank employee who witnessed the robbery, both of whom provided a description of the robber.  2R28-37.  Ramos described the robber as a man around his forties between 5'4" and 5'5" tall and 130-140 pounds, with an average build, and a light complexion.  2R35, PX10.  Chavez described him as a Hispanic man between 35 and 40 years old and 5'3" and 5'4" tall, with a light complexion and an average build.  2R37; PX11.

---

[2] Citations to the trial transcript shall be in the following form: [volume number]R[page number(s)].  Citations to the trial exhibits shall be in the following format: [Exhibit Folder: Joint Exhibits ("JX"), Plaintiff's Exhibits ("PX"), Defendant's Exhibits ("DX")][Exhibit Number]:[Page number(s)].

[3] Although SA Cannella disputed this title repeatedly at trial, Task Force Officer Arturo Ruiz and SA Lorenzo Perez and SA Kyle Matthew Casey, and SA Kristen Curtis Hughes all testified that SA Cannella was assigned as the lead agent for the robbery investigation, and that other agents help the lead agent and receive assignments from either the lead agent or a supervisor.  1R 30, 286-287, 295; 2R13; 3R222, 243.

3.       SA Lorenzo Perez ("SA Perez") interviewed Bernice Mercado ("Mercado"), the customer service representative teller manager who had been standing with Ramos when the robber first approached the teller station and said that he forgot his identification. 1R295-302; PX4-5. Mercado provided the following description of the robber: Hispanic male, 30 to 40 years old, 5'5" tall, between 160-180 pounds, light skin, a light beard, glasses with no frame, and arch eyebrows; when she ran to lock the doors after being alerted to the robbery, she saw the robber leaving in a black car.[4] *Id.*; 2R150.

4.       Task Force Officer Arturo Ruiz ("TFO Ruiz"), with the El Paso Police Department ("EPPD"), distributed a Special Bulletin to law enforcement, which contained some surveillance photos of the robber wearing a beanie, and included the following description: Hispanic man in his late 30's, between 5'3" and 5'5" tall, with an average build and a light complexion. 1R34-44; JX3. This description was created from pulling together the descriptions given by witnesses at the scene of the robbery. 1R33-34. The Special Bulletin also described the vehicle used in the robbery as a four-door, mid-sized, light-colored car with tinted windows and paper plates displayed in the rear window. 1R34; JX3. The photos TFO Ruiz used in the bulletin were obtained from the FBI. 1R36-38; 2R52-53, 59; JX3.

5.       The FBI released a wanted bulletin with photos of the robber to the press, describing the robber as between 5'3" and 5'5", 35 to 40 years old, with a light complexion; it did not describe the robber's weight. 1R48; JX14.

---

[4] Although SA Cannella indicated that Mercado obtained only a glimpse of the robbery, the facts show otherwise. *See* 1R295-302; 2R150, 167-171; 3R120; PX4-5.

3

6.     The FBI press release did not include photos and included the same description, but additionally described the robber's weight as between 130-160 pounds.  1R44-47; 2R60; JX15.

7.     Two suspects were brought to the bank for identification and were not identified.  1R50-52.

8.     SA Cannella reviewed the surveillance video at the bank, but only the portion of the video showing the robber entering the bank around 11:15 a.m. and then exiting the bank after the robbery at approximately 11:22 a.m., which were the only times reported to her by witnesses. 2R:41-46, 48, 74-78; PX10.

9.     SA Cannella took possession of four disks containing the surveillance video recovered from First Federal Bank.  2R41, PX12.  One disk included video from eight different cameras situated in the bank.  2R101-103.  This footage spanned from 10:15 a.m. to 12:00 p.m. on the day of the robbery.  PX10.  The video from the front door showed the robber entering the bank at approximately 10:45 a.m. and contained a frontal or partial side view of the robber, who was not wearing a beanie at the time. 2R78, 83-84.  The first time SA Cannella saw the footage of this portion of the surveillance video was when Plaintiff's counsel played the video at trial.  2R79-80.  During the investigation, she was focusing on the times reported to her by witnesses.  21R104-118.  Additionally, for security reasons, she was only able to view the video on a designated computer in the FBI office, which was not equipped with the technology to allow her to switch camera views; she was only able to view the video of the camera at the back of the bank, the parking area.  2R75, 94, 103-110, 118-122, 131-136; PX12.

4

**B.      Wednesday, January 13, 2010**

10.      On Wednesday, January 13, 2010, Martha Valles ("Valles") contacted the FBI, stating that
         she had seen a picture of the robber on the news and the internet and that it "looks just like"
         Elias Camacho ("Camacho"), her best friend's ex-boyfriend, with whom she remained
         friends.  2R137-142.  SA Cannella interviewed Valles telephonically.  2R142.  Valles stated
         that Camacho does not have an average look, but had very distinct characteristics, including
         "Chinese eyes" and a distinct smile.  DX9:1.  Valles described Camacho as follows: 41-42
         years old; between 5'5"-5'6" tall, with a medium build, goatee, glasses, and a black BMW,
         but access to a lot of cars.  DX9:2.  She described him as a "money guy," going from job to
         job, having several businesses that failed, and as the kind of guy who would do research and
         know that a bank had been hit several times.  DX9:1.

11.      SA Cannella asked TFO Ruiz for his opinion on Camacho as a suspect for the robbery.
         1R55-58, 74-75; 2R145-147; JE7.  TFO Ruiz emailed that his "big problem is the height and
         weight listed on the [driver's license] and [in the EPPD] records."[5]   JX7.  TFO Ruiz
         informed SA Cannella that records, most recent in 2007, reported Camacho as 5'6"- 5'9" tall,
         185-220 pounds.  1R55-58, JX7.

12.      At approximately 11:00 a.m., SA Cannella, accompanied by SA Perez, conducted a "drive
         by" of Camacho's home.  2R149; PX34:2.  The "drive by" was conducted to determine
         whether any vehicles around the home matched the descriptions of the vehicle used in the
         robbery.  2R149-150.  Around 5:30 p.m., SA Cannella conducted surveillance for a second

---

[5] SA Cannella testified that TFO Ruiz's "big problems" were not "concerns" just
differences.  2R146.

time of Camacho's home, this time accompanied by SA Kyle Matthew Casey ("SA Casey"). PX14.

13.    At approximately 6:04 p.m., SA Cannella conducted a ruse by knocking on Camacho's door and asking for "Sara."  1R109, 305; 2R151-154; PX14.  After viewing him in person, SA Cannella concluded that Camacho matched the physical description of the robber.  PX14. She did ascertain that neither the height nor the weight that she observed matched the consensus description, but, finding him to have a light complexion, SA Cannella was "convinced that he depicted the individual in the picture, or that there was at least a close enough resemblance to continue pursuing Camacho." 2R152-154.  SA Cannella did not conclude at that time that Camacho was the robber.[6]  2R154.  Although TFO Ruiz would characterize Camacho's complexion as medium and not light, it was his opinion that Camacho met the parameters of the consensus description.  1R67-68.  SA Kristen Curtis Hughes ("SA Hughes") also described Camacho's complexion as dark.  3R250. SA Perez also described Camacho's complexion as medium to dark.  1R313.  The Court finds that Camacho's complexion is medium to dark.

**C.    Thursday, January 14, 2010**

14.    On Thursday, January 14, 2010, the FBI conducted surveillance of Camacho, during which time he made two separate visits to the same Capital Bank branch in El Paso, making cash deposits of $111 and $100.  3R:67; JX8.

---

[6] SA Cannella's testimony that she did not conclude that Camacho was the robber at that point conflicts with her sworn probable cause affidavit.  2R154; PX27:3.

15.     FBI agents presented a photo lineup of six photos, including one of Camacho, to Ramos (PX9, DX2), Chavez (3R238-241, DX1), and possibly a third bank employee, Mercado (2R:167-171).  The photo lineup did not include any other identifying information, such as height and weight, and such could not be determined from the photos.  1R316; 2R163. The photo lineup was derived from drivers license pictures, of Camacho and other individuals chosen because they look similar to Camacho. 3R:126-127.  None of the people in the photos were wearing beanies or glasses. 1R314.

16.     Ramos selected Camacho's photo out of the lineup immediately and with a high level of certainty.  1R289-292; 2R170; DX2.

17.     Chavez selected Camacho's photo out of the lineup "as the person who resembled the man who robbed" the bank. 1R89; 3R240, 252; DX1. She was, however, not 100% certain that Camacho was the robber, and she rated her certainty as 8/10, which SA Hughes would have interpreted to mean that she was fairly certain. 2R170; 3R241-242.

18.     Mercado, the third bank employee, did not make an identification; it is unknown if she was shown the photo array or declined to look at it.  2R170-171.

19.     Around 3:00 p.m., Camacho was at the drive-thru of a Whataburger with his wife, Veronica Camacho ("Veronica"). 2R174; 1R59-60.  Unmarked cars blocked them in, and then individuals with guns and badges began screaming at Camacho and his wife.  1R115-116. The individuals informed Camacho and his wife that they were the police and demanded that the Camachos put their hands through the car windows.  *Id*.  Officers pulled Camacho and Veronica out of the car.  1R116. Camacho was frightened. *Id*.

20.   The officers placed Camacho in the back of an unmarked vehicle and drove to his home. 1R116.  The agents ignored Camacho's pleas for an explanation as to why he was being arrested.  1R118.  Camacho was nervous and scared and threw up.  1R117.  Camacho saw his wife arrive at their home surrounded by agents. 1R119.   The officers asked Veronica for permission to search their home and Camacho quickly yelled to his wife to consent and sign whatever forms were needed, which she did. 1R119; 2R175.

21.   SA Cannella arrived, held her phone up to Camacho, said "Yeah, it's you," and left again without telling him why he had been arrested. 1R119.

22.   Camacho was then taken to the Pebble Hills Regional Command Center. 2R175.  He still had no idea why he had been arrested. 1R121-122.  Finally SA Cannella told Camacho that she had caught him committing a bank robbery. 1R122.

23.   This Court has already ruled that probable cause existed for Camacho's arrest on Thursday, January 14, 2010.  Doc. 45:26.

**The investigation at Camacho's home**

24.   Agents performed a search of Camacho's home. 3R66-67.  During that search, agents located a "bank receipt" for $1,622.  It was a yellow carbon copy of a business check from a company named "Copart" made payable to an individual named "Gustavo Espinoza" ("Espinoza") in the amount of $1,622, which stated "void if over 6 months from *check* date" and had "non-negotiable" stamped on the signature line.[7]  3R67; JX4 (*emphasis added*).

---

[7]  Although the government argued that the evidence showed that the agents were extremely aware that the document was a third party check from Copart to Gustavo Espinoza, SA Cannella testified that it was not clear what the document was—that it was a receipt of some type of fiduciary instrument, her notes and report reflect that she asked Camacho about a money order and cashier's check, and the record reflects that SA Cannella spent time trying to identify what

25.     The amount of the Copart check ($1,622), combined with the two deposits Camacho had

        made to an account at Capital Bank earlier that day ($100 and $111), equaled the amount

        stolen in the bank robbery ($1,833).  3R67.

26.     The agents also searched Camacho's vehicle and found a MapQuest printout providing

        directions from Camacho's house to a business on the west side of town in the vicinity of the

        bank.  3R65.

27.     Veronica told agents that she could not remember what they had done, because she was very

        frightened; she told them that Camacho had gone to run some errands that morning, but she

        was not able to specify hours of when he returned; she told the agents that she and Camacho

        had gone out, and had gone over to her mother-in-law's, but she could not remember exactly;

        she could not tell them a precise time when Camacho was home or away.  3R200-201, 211.

        Veronica testified that she never told the agents that Camacho may not have come home until

        12:30 p.m. on that Tuesday.  3R57, 77, 211.  She told agents that Camacho was six months

        behind on mortgage payments.  3R56.  The agents asked about a computer, and she said they

        could take it with them to look at it.  3R211-212.

**The Investigation at Camacho Sr.'s home**

28.     At approximately 5:00 p.m., agents went to Camacho's father's home ("Camacho Sr."),

        where SA Kent Switzer ("SA Switzer") showed him two of the bank surveillance photos and

        asked if the person in the photo was Camacho.  1R233-236; DX16.  He told the agents that

---

type of document it was.  *See* 2R215; 3R68-72; 4R24-25; PX17; PX37.  SA Cannella testified
that she believed that the Camachos owned Copart or that Copart is his father's business, because
the Camachos told her that they work at or with Copart.  2R217.  She was not sure why she
thought that; she would have to check her notes to see what they had said about that.  *Id*.

while there was some resemblance, it was not Camacho.  1R235-236.  Camacho Sr. stated

that Camacho does wear "beanies" and had recently bought some new glasses.  DX16:2.

Camacho Sr. told the agents that he had seen Camacho earlier on Thursday because he had

asked him to stop by and pick up both a copy of a check for $1,622 that needed to be returned

to Copart Salvage Yard ("Copart") and the $100 that he owed Camacho for helping to return

a stolen vehicle to the United States.  1R237-239; DX16.

29.     Camacho Sr. explained to the agents that: (1) he works with Copart and Espinoza to retrieve

stolen vehicles from Mexico; (2) that the wrecker accidently gave Espinoza the yellow

carbon copy of the check from Copart when he delivered the original check to Espinoza; (3)

Espinoza gave the yellow carbon copy of the check to Camacho Sr. to return to Copart for

their records; and (4) Camacho Sr. asked Camacho to return the document to Copart for him.

1R95, 230-232, 237-239; DX16.  Camacho Sr. is a retired police officer with the El Paso

Police Department. 1R93.

30.     Camacho's mother told agents that Camacho was at her residence twice on Tuesday, at 11

a.m. and then at 2 p.m.  3R64, 76.  Camacho Sr. overheard his wife telling the agents that the

person in the surveillance photo was not Camacho.  1R239.  When they asked her how she

knew, Camacho Sr. heard her answer "Because I gave him birth." *Id*.

31.     When Camacho's brother, Marco Camacho ("Marco"), a long-time United States Border

Patrol Agent, arrived at Camacho Sr.'s house, the agents showed him the bank surveillance

photos and asked if the man in the photos was Camacho. 1R239, 268-269; DX15.  Marco

told the agents that one of the pictures looked a little bit like Camacho, but that Camacho did

not wear glasses like that and did not wear beanies. 1R269.  He told them that the other

picture did not look anything like Camacho; he did not see the resemblance. *Id*. Marco at no time positively identified the man in the photos as his brother. 1R271. The agent's report of the interview stated that Marco "indicated the person in the bank surveillance photograph looked like his brother." DX15.[8] Marco told the agents that Camacho was having financial problems and difficulty paying his bills. 3R56; DX15. He said that Camacho has a key to Marco's house and is often there when Marco is at work. DX15. The report also indicated that Marco said he would not be shocked if Camacho robbed a bank; Marco does not recall saying that and does not think he would have said something like that. *Id*., 1R272-273.

**The interview**

32. Camacho was nervous but cooperative with law enforcement: he waived his rights, consented to searches, agreed to talk, answered questions, and did not ask for a lawyer.[9] 1R61, 119; 2R176; 3R74.

33. While his home was being searched and his family was being interviewed, SA Cannella, SA Hughes, and TFO Ruiz questioned Camacho for at least two hours at the Pebble Hills Regional Command Center. 1R61, 120; 2R177, 180; 3R66. At the time of the interview, SA Cannella personally believed that Camacho had committed the robbery. 2R182.

34. During the interview, Camacho continually asserted his innocence, explained in detail the origins of the carbon copy of the Copart check found in his home and his whereabouts on the

---

[8] Cannella's testimony that she was advised that Marco pointed to the picture and said "That's my brother" is not supported by the record. 3R75. Defendant did not call SA Lonnie M. Camacho to testify, but his 302 report states that Marco indicated that the person in the bank surveillance photograph looked like his brother. DX15.

[9] When asked if Camacho was cooperative, she responded "I would say there was a level of cooperation." 2R176.

morning of the robbery. 1R126; 2R178.  While Camacho cooperated with the agents, he felt

that the agents were ignoring everything he said, calling him a liar, just trying to get him to

say that he had robbed the bank, and were very unprofessional, calling him "dude" and "bro."

1R129.

35.     **Whereabouts:** Camacho told agents that he was on the east side of El Paso at a company

named Therm-O-Link during the morning of Tuesday, January 12, 2010, to visit Amy

Ramirez ("Ramirez"), a customer. 1R90; 2R186-187, 204; 3R63.  Camacho explained to

agents that he spoke to Ramirez about office products and even identified for the agents the

specific products they discussed. 1R125; 2R187.  He told SA Cannella about a power outage

that occurred while he was at the business; the lights flickered. 1R125.  He also informed SA

Cannella of another interaction he had with a Therm-O-Link employee regarding the

purchase of a special type of tape. 2R187.  Camacho repeatedly stated that he could not

remember the exact time that he was at Therm-O-Link, but after SA Cannella suggested a

time frame of 9:30 a.m. to 10 a.m.,[10] he stated that he could have been there at that time, but

was not sure.  1R125, 165, 198-199; PX17, 37.  He guesstimated that he had been there

approximately 20 minutes. PX17, 37:5.  He told her that he went home and emailed Ramirez

a quote for the trash can and tried to find the flat back tape. 1R126, 199.  Camacho and

Vanessa then went to Contessa for lunch, left there around 1:30 p.m., and went to his

mother's house.  PX17:4.

---

[10]  It is beyond this Court's understanding why SA Cannella never asked Camacho about
his whereabouts at the exact time of the robbery and did not tell Camacho exactly when the
robbery occurred.  *See* 1R199-203.

36.  **Tuesday & Wednesday:** The questioning, answering, or both, did not proceed in chronological order.  PX37.  SA Cannella's handwritten notes from this interview and her 302 report memorializing the interview demonstrate that, regardless of whether at some point in the interview there was some confusion regarding which day Camacho went to Therm-O-Link, it was clarified that he went to Therm-O-Link on Tuesday morning and was with his brother-in-law at a school function on Wednesday morning.  PX37:5; 1R128, 200-201; 3R53, 135-137, 158; PX17:4-5.  SA Cannella's 302 report does not indicate that there was any confusion regarding whether Plaintiff was at the school event on Tuesday or Wednesday.  PX17:5.  After the interview, SA Cannella searched online for information about the school function and confirmed that it was on Wednesday.  3R57-61.

37.  **Westside**: SA Cannella testified that Camacho told the agents that he does not go to the west side.  3R65.  The evidence in the record does not bear this out.  SA Cannella's notes regarding Camacho's interview reflects that Camacho said he does not go to the west side "that much."  PX17:5, 37:6.  Camacho said that he and Veronica had gone to a delivery service on Emory, to which the Mapquest printout provided directions, on Wednesday after the school event and before going to State Line for lunch.  *Id.*  Also, the notes do reflect that his sister lives on the west side.  *Id.*

38.  **Finances**: Camacho told the agents that he was working five jobs and was having difficulty paying his bills; he did not say that everything was fine financially.  Camacho stated "he has enough money for everything his family needs. Camacho stated he cannot pay his cell phone bill but he does not need a cell phone. Camacho stated he could go to his family for money if he needed the money."  PX 17:6, 37:6-7.  Camacho also acknowledged that he was

13

struggling at INDOFF, but that he was also only giving about 20% effort to his job at INDOFF. *Id.* The interview notes reflect discussion of Camacho's cell phone and estimated utility costs, his mortgage, and child support; there is no indication that he stated or was asked whether he was able to pay each individual bill. PX37:8.

39. **Copart check:** Camacho explained that he did not have a money order for $1600, but had a carbon copy of a check for $1600 made out to Gustavo Espinoza, because when the Copart wrecker driver paid Espinoza for the vehicle, he gave Espinoza the carbon copy as well, and Camacho Sr. had given Camacho the check to take back to Copart. 1R126-127. He explained what his father's company, E.C. Repatriation, does and how they do it. *Id*; PX37:4. Camacho explained that Copart brings the vehicles and pays Espinoza, that Copart charges all the fees to the insurance company, Copart pays for vehicle recovery, and when the insurance has paid, Espinoza comes to get his check. PX37:4, 10. Camacho explained that Copart would not pay Espinoza with a money order or a cashiers check. PX37:10. He also explained that he, "Camacho would not pay Espinoza any money to include, a money order or cashiers check." PX17:3. "Copart charges all the fees to the insurance company when the vehicle is sold. Espinoza pays Camacho, Sr and Camacho Sr pays Camacho." *Id*.

40. At 5:37 p.m., SA Cannella sent the following text to Supervisory Special Agent Hector Camarillo ("SSA Camarillo"): "Feeling iffy, going 2 try & set up poly, may release &[]have show up tomorrow & if doesn't, get warrant if kent can't do it now, kent calling polly buddy to consult[.]"[11] 2R223; 3R51-52; PX32:2.

---

[11] Although SA Cannella confirmed that she had felt "iffy" after the Thursday interview, she also maintained that no information that she had obtained since his arrest weighed in his favor. *See* 2R229; 3R83-84.

41.    At approximately 5:42 p.m., the agents released Camacho from custody after he agreed to voluntarily return for a polygraph examination the next morning. 2R230; PX32:2.  TFO Ruiz testified that SSA Camarillo made the decision to release Camacho on Thursday night, understanding that Camacho had agreed to return the next day to take a polygraph.  1R70, 130-131.  Camacho testified that SA Cannella became visibly upset when SSA Camarillo entered the room, sat next to Camacho, told him not to worry, that he knew it was not him, and told him to go home. 1R130-131.

42.    That evening, a number of agents, including SA Cannella, TFO Ruiz, and SA Casey, met to review the evidence they had gathered in the investigation and to talk about the next steps. 3R77.  TFO Ruiz understood that Camacho's alibi, the Therm-O-Link information, would be checked out; however, SA Cannella did not make any attempt to contact Therm-O-Link or ask any agent to perform this task. 1R66, 69; 2R224-229.

43.    At some point,[12] SA Cannella learned that Camacho was two months behind on his rent, the bank had started warning Camacho Sr.— who owned the mortgage on the house—about foreclosure; Camacho had taken out a second loan on the house for approximately $3-4,000; Camacho was behind on his child support by about $5,000; and Camacho had received termination notices from the electric company due to problems paying the bill.  1R189-197, 225-226.

**D.    Friday, January 15, 2010**

_____

[12] It is not clear from the record at what point agents discovered these additional financial facts.

44.     On Friday, January 15, 2010, at around 6 a.m., SA Cannella had the carbon copy of the Copart check, ran a database check of the routing number, and called the bank in an attempt to vet the information given about the check. 3R:68-72. Based on SA Cannella's description of the document, the bank officer she contacted was unable to discern what type of document it was. *Id*.

45.     At approximately 9:00 a.m., Camacho reported to El Paso FBI Headquarters for a polygraph examination. 1R134. He was accompanied by his mother, father, and wife. 1R133, 243. He appeared voluntarily and without counsel. Upon his arrival, he handed SA Switzer a receipt for an expenditure he made on January 13, 2010, and a Therm-O-Link business card for Ramirez, with whom he had met on the morning of January 12th. 1R134-135; 1R243. Ramirez's business card contained several ways of contacting her. Specifically, it had her business phone number and email address and the address for Therm-O-Link, which is 1295 Henry Brennan. 3R162, 168; PX38. The card does not say anything about business hours or phones answered 24/7. 3R196. Camacho was escorted by SA Switzer from the lobby to the polygraph room.1R133-135.

46.     At approximately 9:48 a.m., Camacho waived his rights. DX19:2; PX39:2. SA Switzer spoke to Camacho for some time prior to connecting him to the polygraph machine. 1R136; DX19:2. No recording or transcript of such interaction, the polygraph, or the subsequent interrogation, was introduced and SA Switzer did not testify; SA Casey took some handwritten notes before Camacho failed the polygraph. PX39. SA Cannella watched at least part of the procedure from outside of the room, but neither she nor SA Casey recall which parts she saw. 2R230-231; 3R266.

47.  Camacho was very nervous about the polygraph examination.  He was afraid the test would show that he had robbed the bank when he had not.  He testified that the agent made him feel extremely nervous.  SA Switzer told Camacho that he would be asked whether he had ever stolen from anybody that he loved and whether he had ever lied to his loved ones.  1R136.  SA Switzer screamed at Camacho that if he answered yes to either of these questions, the test would be over. 1R136, 211-212.  Camacho understood SA Switzer to be telling him how to answer these questions, i.e., to lie.  1R136.  Camacho was very nervous about the polygraph examination.  Camacho was scared, terrified; he kept thinking he needed to answer the way SA Switzer was telling him to answer, so that he could take this test and prove his innocence. 1R136-138.

48.  SA Switzer explicitly told Camacho to lie for a preliminary test and he did.  1R137.  Camacho was scared, terrified, shaking—so much that SA Switzer yelled at him to stop moving— and sweating—so profusely that the pads had to be taken off and his skin dried to proceed.  1R138.  Camacho testified that he did lie on the questions SA Switzer had told him he could not say yes to without cancelling the test, because SA Switzer essentially told him to.  1R139-140.

49.  Camacho said that he had receipts and people to verify where he was, that "he was with a customer during the robbery," that he said "he did not rob the bank, again says has alibi," and that on Tuesday at about 9:30 or 9:45 a.m. his appointment cancelled and then he went to Therm-O-Link at about 10:30 a.m.  PX39.  Camacho stated that he got to Therm-O-Link "10:30" or "10:45", that he was there for "15 or 20 minutes," that "the lights went out," and that he went straight home around 11:00 a.m. and emailed Amy a quote for the trash can.

17

PX39.  Camacho stated that he "was never on westside on Tuesday."  PX39:3.  SA Casey noted "11:46 Fails Poly [SA Switzer] begins Interrogation."  *Id.*; 3R266.

50.     At around 11:46 a.m., SA Switzer told Camacho he had failed the exam and began to interrogate him.  1R141-143; 3R266; PX39.  SA Switzer yelled at Camacho "Well, I know you're lying.  My machine doesn't lie.  I know you did it."[13]  1R141.

51.     SA Switzer continued with the interrogation.  Camacho maintained his innocence.  1R141. SA Switzer told him they needed to start talking with the truth, Camacho said he had been telling the truth.  *Id*.  SA Switzer asked what Camacho had written on the note and Camacho said "Nothing, I didn't write any note. I didn't do a bank robbery."  *Id*. SA Switzer continued to ask him why he did it. *Id*.  The questioning went on for approximately 45 minutes.  1R142. Camacho had asked for SA Cannella twice and the second time SA Switzer went to get her, stepping outside the room and then immediately both of them stepped back into the room. *Id*.  SA Cannella said "Dude, you even lied about lying to your parents; I lie to them all the time."  1R143.  And Camacho said "I didn't lie; I didn't do it.  You have the card. Please call Amy."  *Id*.  SA Cannella responded "I don't need it. I know you did it." *Id*.  SA Cannella and SA Casey told Camacho that Marco was a stand-up guy and had already told them Camacho committed the robbery, and asked Camacho to tell them why.  1R143.  Camacho answered "My brother is an idiot. He knows I didn't do it.  I didn't do it.  You guys are wrong."  *Id*. Camacho kept telling SA Cannella "Copart is right down the road.  Please go talk to them. You have Amy's card.  Please."  1R126, 144.  Camacho told SA Cannella that he was at

---

[13]  On cross-examination, Camacho confirmed SA Switzer's unprofessional conduct. 1R212.  Defendant could have called SA Switzer to the stand, but failed to do so.  Camacho's testimony as to what occurred during the polygraph process was unrebutted.

Therm-O-Link at 10:45, the lights flickered, there was a gentleman filling out paperwork, putting his mother on his insurance, another man, Chavira, gave him a sample of tape, Bustamante passed by when the lights all went out; he told her to please call Amy.  1R166.

52. SA Cannella was present once the initial polygraph part was completed, to be advised of the results, and then she left again, and returned when she was informed there was a written statement.  3R81-82.  SA Switzer told SA Cannella that Camacho had failed the polygraph, that the results of the test were indicating deception, and SA Switzer continued with an interrogation.  3R81.

53. After Camacho was led away to take the polygraph test, Camacho Sr. had spoken with SSA Camarillo.  1R244.  They recognized each other from when they worked together at the EPPD.  *Id*.  SSA Camarillo told Camacho Sr. not to worry, that he had seen the surveillance photo, and knew that the robber was not Camacho.  *Id*.  Further, SSA Camarillo told Camacho Sr. that Camacho would be released after the polygraph examination.  *Id*.  Camacho Sr. mentioned Camacho's alibi to SSA Camarillo and was told that someone was already checking out the alibi.  *Id*.  After approximately forty-five minutes, SSA Camarillo returned and asked Camacho Sr. whether there was anything wrong with his son, mentally, Camacho Sr. said no, and SSA Camarillo left again.  1R245-248.  Approximately five hours later, TFO Ruiz spoke with Camacho Sr. in a little conference room.  *Id*.  He told him that Camacho had failed the lie detector test and that the agents think Camacho hid the money with some family members.  1R246-247.  They asked Camacho Sr. what happened to the money and told him that an agent, expert in finding hidden money, would be looking into the family finances.  1R247-248.  Camacho Sr. asked about Camacho's alibi and was told that

it did not work out. 1R247.  The agents told Camacho Sr. that Camacho would not be going home.  1R248.

**The statement**

54.   SA Switzer wrote up Camacho's explanation of his actions on the day of the robbery and prepared a statement, which Camacho signed.  1R144-146; 2R232-233; JX12; DX14.  This statement was also witnessed and signed by SA Cannella and SA Switzer.  *Id*.

55.   In his statement, Camacho said that he arrived at Therm-O-Link between 10:30 a.m. and 10:45 a.m.  2R233.  Camacho said he was going to Therm-O-Link in his professional capacity as an Indoff salesman to establish a sales account with them. JX12. There he met the Administrative Assistant, Ramirez.  *Id*.  Ramirez is in charge of purchasing items for Therm-O-Link.  *Id*.  He and Ramirez discussed the purchase of a trash can.  *Id*.  While he was at Therm-O-Link, a male supervisor also discussed flat back tape with him and provided a sample of the tape.  *Id*.  While Camacho was at Therm-O-Link, "the lights flickered on and off and then the warehouse power went out."  JX12.  Ramirez explained to Camacho that a long process was required to restart the machines.  *Id*.  Understanding that Ramirez was busy, Camacho told her he would provide her a quote, said goodbye, and left.  *Id*.  Camacho estimated that he was at Therm-O-Link for approximately 15-20 minutes.  Camacho arrived home "around 11:10 a.m. to 11:15 or 11:20 a.m." 1R199; PX12.  He logged on to a secure web page, which required him to submit three passwords.  *Id*.  He emailed Ramirez a quote on two different trash cans.  *Id*.  He also "put in a blog" to request the help of other Indoff partners in locating the flat back tape.  *Id*.  The statement also reflects that Camacho "has given a business card to the agents."  *Id*.

20

56.    Therm-O-Link is 23.1 miles from the First Federal Bank that was robbed.  JX10.  Driving

from Therm-O-Link to First Federal Bank at the speed limit, with no traffic delays, takes

approximately 26 minutes.  *Id*.

**The second arrest of Camacho on Friday, January 15, 2010, at 3:01 p.m.**

57.    SA Cannella arrested Camacho for a second time on Friday, January 15, 2010, at 3:01 p.m.

PX19:4.  Camacho testified that SA Cannella sat in front of him and said "Look dude I might

be wrong, but I don't think I am. You're under arrest."  1R146.  Camacho felt like he was

going to black out or faint, he was so scared because he knew he had not committed the

robbery.  *Id*.

58.    Although SA Cannella had known that Camacho had provided Ramirez's business card, she

did not obtain the card from SA Switzer until she arrested Camacho on Friday.  2R231, 242.

At that time, SA Cannella had not yet attempted to contact Ramirez, and she did not call or

attempt to contact Ramirez, and did not ask any other agent or Task Force Officer to contact

Ramirez to verify Camacho's alibi before arresting him on Friday afternoon.  2R250; 3R83.

At that time, SA Cannella did not believe that Ramirez had possible exculpatory information.

2R244.  SA Cannella was not concerned with Ramirez, because SA Cannella understood

Camacho's written statement to say that he was at home during the time period of the bank

robbery. 2R232; 3R83.  SA Cannella did not view Therm-O-Link as a possible alibi even if

Camacho left there at the outside range of his time frame at 11:05 a.m., because it did not

completely exclude him from possibly being the bank robber.  2R234-237, 241.

59.   SA Cannella transported Camacho with SA Casey to the El Paso County Detention Facility. 3R85-86. SA Cannella completed the booking information, which indicated that Camacho was approximately 5'7" and 190 pounds.  *Id.*; PX19/JX5.

60.   While Camacho was in jail, he felt a total sense of loss; he was terrified and unable to sleep, fearing for his life— he had never been anywhere like that; he was unable to eat and threw up through the night; he didn't talk to anyone.  1R152-154.

61.   SA Cannella returned to her office after booking Camacho and sent an email at 4:33 a.m. on Saturday, January 16, 2010, requesting assistance from SA David F. Schwarz ("SA Schwarz") in searching Camacho's computer that was seized from his home.  3R99-104; DX12.  She was seeking "anything Bank robbery related since Tues (date of robbery), photos, news, etc, the bank info or internet activity on Tuesday..." *Id*.

62.   Camacho saw his father on Sunday, January 17, 2010, for fifteen minutes. 1R157-158.  His father told him not to worry, that they knew he did not do it, and that they had hired an attorney for him. *Id*.  Camacho was able to see his wife and mother for about fifteen minutes that day as well.  1R158.  Camacho could not get any words out, he just cried and tried to tell them "I promise you, I didn't do it."  *Id*.  He felt better knowing his wife was okay and that they believed him.  *Id*.  On Monday, Camacho met with his attorney, Mr. Islas, who told him about a court appearance the next day. 1R159.

63.   No agents or task force officers working the robbery made any attempt to contact Therm-O-Link until Tuesday, January 19, 2010.[14]

---

[14]   Unknown to agents at the time, because they assumed it would be closed in the evening and over the holiday weekend, Therm-O-Link is open 24 hours a day and 7 days a week. 2R245-250; 3R7-12, 165-167.  Ramirez' work hours were from 7:30 am to 4:30 pm, Monday

**E.     Tuesday, January 19, 2010**

64.     On Tuesday morning, between 7 a.m. and 9:30 a.m., SA Cannella presented a criminal

complaint to the United States Magistrate Judge, and it was signed by United States

Magistrate Judge Margaret Leachman.  3R36, 46.

65.     SA Cannella's affidavit in support of the complaint alleged several facts supporting probable

cause to arrest Camacho, including: (1) photos of the robber were released on January 12,

2010; (2) a person, stating she was a friend of Camacho's called in and said the picture

looked just like Camacho; (3) on Thursday, two tellers involved in the robbery identified

Camacho out of a photo spread; (4) SA Cannella went to Camacho's house on January 13

and after seeing him, concluded that he was the same person depicted in the robbery photos;

(5) a search of Camacho's residence revealed a bank transaction receipt for an amount, which

combined with his two cash bank deposits, equaled the amount stolen; and (6) subsequent

to his arrest, Camacho's brother identified Camacho as the person in the bank surveillance

photos.  PX28:2.

66.     Camacho was escorted to court later that morning by SA Cannella.  1R161-162.  On the way

over, she told two people who asked if he was the bank robber "yep, and I got him" or "yep,

and he thought he was going to get away but he didn't." *Id.*  A Deputy United States

Marshall Camacho had gone to high school with saw him and asked what happened and said

he saw it on the news and didn't think it looked anything like him.  1R163.

---

through Friday, but the facility operated 24/7; someone is there to answer the phone 24/7 and
could have gotten a message to her.  3R165-167.  Ramirez's birth name is Armida, she goes by
Amy in customer service; this did not come up in the interview with the agents on Tuesday
January 19th.  3R187-188.

67.     SA Cannella and SA Casey went to Therm-O-Link and interviewed Ramirez around 9:30 to 10:30 a.m. for forty-five minutes to two hours.  3R12-13, 45, 104-112, 183-184, 215-218.

68.     Ramirez said she had known Camacho for five or six months and that she specifically requested him as her sales representative.  PX29.  She explained that she met Camacho when he worked for NOVA.  3R170; PX29.  She had met him in person five or six times over five months; he was very helpful.  *Id*.  Camacho had cold called Ramirez to let her know that he was working at a different company and to ask if Therm-O-Link might be able to use the new company.  3R170.  He told her that he would come to Therm-O-Link in the morning.  *Id*.  Ramirez did not know Camacho outside of work.  3R186-187.

69.     Ramirez noted that Camacho had commented that he was wearing sneakers on Tuesday, January 12, although he usually wears dress shoes.  3R30; PX29.

70.     Ramirez was neither nervous nor confused; she informed the agents that Camacho was at Therm-O-Link at some point between 10:00 a.m. and 11:30 a.m. for approximately thirty to forty-five minutes on Tuesday, January 12, 2010.  3R172, 181-182, 189; PX29.  She was not certain as to when Camacho arrived or when he left.  3R216-217.  She also told agents that while Camacho was at the business, Therm-O-Link suffered a power outage—the lights flicker and the machines go quiet; Camacho was there when the power went out and when it came back on.  3R172-175, 196-197; PX29.  Although Ramirez was unable to determine the exact time of Camacho's visit, she was able to tell SA Cannella that Camacho emailed her at 12:10 p.m. about their meeting that morning; Ramirez provided SA Cannella a copy of the email.  PX29, 30.

71.  SA Cannella also found it suspicious that the time frame Ramirez gave was not consistent with the one Camacho provided, nor did it actually foreclose the possibility that Camacho had committed the bank robbery.  3R29.  SA Cannella also found it suspicious that Ramirez seemed to be very friendly with Camacho.  *Id*.  SA Cannella was suspicious that there may be more going on between Ramirez and Camacho.  3R29; 3R116-117.

72.  After learning of the 12:10 p.m. email, SA Cannella believed that Camacho would have had time to rush home after the robbery and send Ramirez the email; or that Camacho did not send the email from home.   3R:17, 20, 23.

73.  Ramirez directed the agents to Greg Carr ("Carr"), the plant production manager, when the agents asked about video footage to confirm the times when Camacho was there.  3R112-115, 190-193; PX29.  Carr directed the agents to Alex Bustamante ("Bustamante"), the general plant manager.  3R112-113.  Neither Carr nor Bustamante were able to access the video because the server was down and the web page to view the video was not available.  PX29.  Ramirez was not present when the agents talked to Bustamante and she does not know what they discussed.  3R182.  Bustamante remembered Camacho being there, but did not remember at what time.  3R112-115.  He agreed to check the computer for Tuesday from ten to noon.  PX29.

74.  After the agents had left, Ramirez asked Bustamante if he knew when the power went out and he said yes and told her the time was 11:16 a.m.  3R116, 193-194; PX29.  Ramirez called SA Cannella within ten to fifteen minutes of their departure, told her that Bustamante noted the power outage time on his calendar (to report the down time for production to corporate) as 11:16 a.m. and that Camacho was there from 11:16-11:30 a.m., and that she

would be available for follow up questions.[15] 3R26-27, 116-117, 183-184; PX29. Ramirez may have told SA Cannella during that phone call that she had spoken with Camacho's attorney over the weekend, though it is not reflected in SA Cannella's 302 report of the interview. 3R26-27, 116-117, 151. SA Casey knew SA Cannella received a phone call from Ramirez and that Ramirez had new information, but SA Casey was not aware at that time that Ramirez had told SA Cannella what the new information was during the phone call. 3R229-232.

75.    The agents drove around the area of Therm-O-Link for a short time to see if there were video cameras on other nearby buildings; they were not able to identify any. 3R115. Rather than return to Therm-O-Link after Ramirez called, SA Cannella continued to the federal courthouse for Camacho's initial appearance. *Id*.

76.    SA Cannella got email from SA Switzer at 11:27 a.m., saying that he forgot to tell her information from the family that Camacho embezzled money from their restaurant business, which is the main reason it went under. DX13.

77.    In the evening, Camacho was taken into the court room, and his wife, father, sister, brother were all there. 1R163-164. Plaintiff was orally ordered detained during his initial appearance. 1R168.

---

[15] Although part of Ramirez's duties as administrative assistant would be to make follow up calls as directed by Bustamonte, SA Cannella thought it was suspicious that they had found a note jotted on a calendar right after they'd left and that it was Ramirez who called her instead of Bustamonte. 3R26-31, 116-117, 163-164. SA Cannella still did not think Ramirez provided potentially exculpatory evidence, but finally agreed that it potentially could be exculpatory. 3R16-17.

78.   The Court has already ruled that Camacho cannot challenge his detention from this time through his eventual release on January 22, 2010.  Doc. 45:32-33.

79.   Marco got a call from SA Switzer stating that he wanted to search Marco's house; Marco made arrangements to call the agents after he returned home from his brother's initial appearance.  1R273-279.  Agents, including SA Switzer and SA Cannella conducted the search around 8 p.m.  1R275.  Although an FBI acquaintance of Marco's had said that Marco was concerned that, if Camacho had committed the robbery, he may have hidden evidence in Marco's house, Marco had not expressed such concern to anyone.  1R273-280; DX8.  Marco also testified that he did not direct the agents to any "hiding place" in his home.  1R276.   After they searched the house, the shed, and the workroom, the agents asked him if he knew a lady named Amy and asked if he knew that Camacho had a girlfriend; Marco told them he did not.  1R273-279.  SA Cannella told Marco that the agents knew that Camacho had robbed the bank, but that they were hitting a brick wall.  1R278.

**F.   Wednesday, January 20, 2010**

80.   On Wednesday, January 20, 2010, SA Casey and SA Hughes interviewed Ramirez at a Corner Bakery near Therm-O-Link.  3R47-48, 185.  According to SA Casey, Ramirez seemed much more certain as to times and who could confirm at this second interview.  3R219.  Agents called Ramirez on Thursday asking if she would be willing to take a polygraph.  3R195.

**G.   Thursday, January 21, 2010**

81.   On Thursday morning, January 21, 2010, a follow-up interview of Bustamante was conducted by SA Casey and SA Hughes at Therm-O-Link: he showed them charts on the

computer reflecting exactly when the power outage had occurred and was sure Camacho was there when it happened. 3R220-221. Another employee was also sure. *Id*. That, together with Ramirez was deemed credible. *Id*.[16]

82. Camacho was told that he was getting out because the same robber had committed another robbery,[17] but he did not get out on Thursday. 1R171-173.

83. At some point, an order of dismissal was submitted to the court. JX13.

**H.    Friday, January 22, 2010**

84. On Friday, January 22, 2010, the order of dismissal was signed by the Magistrate Judge. JX13.

85. Camacho was taken to court, then back to the jail on Friday morning, before he was released. 1R173-175.

86. In total, he was incarcerated for seven days and seven nights.

**I.    Camacho's damages as a result of his arrest on Friday, January 15th and detention pursuant to that arrest:**

87. Camacho was so scared when he was told that he was under arrest that he felt like he was going to faint. 1R146. He described feeling a total sense of loss. 1R152. His spirit collapsed; he wanted to die; he could not breathe. 1R168. He was devastated; he knew he did not deserve to be there. 1R169. While Camacho was in jail from Friday to Tuesday, he

---

[16] With that information, the agents were not 100% certain about the alibi, but they were definitely very concerned and recognized that there was a serious problem; that information was communicated to SA Cannella. 3R220-221.

[17] When SA Cannella first saw a photo of a suspect of a robbery occurring on January 21st, while Camacho was still in jail, SA Cannella thought Camacho had gone and robbed another bank. 3R50-51.

was scared, terrified, anxious. *Id*. He got headaches. 1R157. He threw up. *Id*. He would get panic attacks- he would start to shake, his stomach would tighten up, get hard, or he would lose his bowels. 1R169. He was not able to sleep more than three or four hours a night. 1R157, 170. He worried what effect his arrest and detention would have on his marriage of six months. 1R157. Camacho Sr. testified that Camacho was shaking, scared, apologetic, and cried on Sunday when Camacho Sr. visited him at the jail. 1R249. When Camacho was released he was relieved, but also ashamed and embarrassed. 1R175. He felt like his arrest was all over the news, on television, and in the papers, including the FBI bulletin of his initial arrest on the internet. 1R175, 213-215. A friend who was in Iraq had heard that Camacho had been arrested and called his mother to see how he was doing. 1R175. Camacho was also very paranoid; he kept turning around thinking they were going to take him back again. 1R250.

88.   After his release, Camacho continued to have difficulties sleeping- every little noise would wake him and he would get up and look outside. 1R183-184. He would check that the doors and windows were closed and felt like someone was watching him. 3R203-204. In 2010, he lost between six hours of sleep a week up to five to six hours of sleep each night. 1R183-184; 3R203-204. He still has difficulty sleeping every night, losing anywhere from six hours a month up to three to four hours of sleep each night, causing him to be tired, dull, and not himself during the day. *Id*. Camacho has suffered recurring nightmares—almost every night in the beginning and still a couple times a month—and he wakes up because he cannot breathe. 1R183-184. Camacho did not have sleep issues prior to 2010. 3R203-204.

89.   Camacho suffered headaches, moodiness, crying spells, depression, and anxiety. 1R185-186; 3R204-205. He began to isolate himself—wanting to crawl into a corner and just stay there. 1R181.  Camacho used to be very outgoing and to like being around people, but does not like to be around people anymore.  *Id*.  Camacho did not suffer from depression before 2010. 3R205.

90.   Camacho developed a strong fear of law enforcement—when he saw police, his heart would start beating really fast, he couldn't breathe, he felt nervous and scared, like they were coming for him.  1R181-182. Camacho is very paranoid when it comes to police. 3R204. In 2010, when Camacho saw a police car, Camacho would think that they were following him and going to arrest him.  3R206.   If he saw them while driving, Camacho would pull over and stop. 1R181-182.  He would get nervous, tighten his hands, bite his nails, start to sweat, lose his stomach, and sometimes vomit.  3R205-207.  This happened maybe four times a month.  *Id.*  He still feels that way, but it has decreased a little bit.  1R181-182.  In 2014 it still happens maybe twice a month.  3R205-206. Aside from these driving events, Camacho had panic attacks almost daily back in 2010, now a couple of times a month, where he feels scared, can not breathe, his stomach gets really tight, he does not want to work or do anything. 1R186.  The last one he had was about a month before trial, when he came home and the street was filled with police cars three houses down from his house.  1R187. Camacho became pale white, he became scared that they were there for him and he did not want to go home.  *Id*. A year after the arrest, Camacho and his father were eating in a restaurant when one of the arresting officers came in; Camacho said they needed to go, he didn't feel right, he started begging to leave. 1R250.  His father told him to calm down and

30

they stayed, but Camacho was very jumpy.  *Id*.  Another time an officer friend was getting

a massage and showed up in a cop car- Camacho got scared, jumpy, paranoid, shaking, and

perspiring. 1R251. Camacho does not feel that he has gotten better over the past four years;

he does not feel safe in his house or in his city; he does not like to go downtown because

there are too many buildings that remind him of what happened. 1R188-189. He is still

paranoid when it comes to police cars or anybody that seems to be in authority or law

enforcement.  1R250.

91.    While over time, the frequency or intensity of these symptoms has lessened, Plaintiff still

feels the effects of his arrest and detention and continues to struggle with depression and

anxiety.  1R185-186.

92.    Camacho gained weight, felt stress all over his neck and back, and has an overall feeling of

not feeling right.  1R185.  Regarding the effect on Camacho's weight: he gained about 10

kilos, he has not been able to lose the weight. 3R209.  His energy has been affected as well:

he has been tired at work.  *Id*.

93.    For some time, he engaged in heavy drinking–every night–to cope with these feelings,

whereas he only drank socially–once to three times a month–before January 2010, but has

been able to get his drinking under control. 1R185-186; 3R207.  Regarding Camacho's

drinking: in 2010 Camacho was drinking a lot, daily.  3R207.   He is now drinking a lot

less—maybe two to three times per month.  1R207-208.

94.    Camacho does not take regular over-the-counter medicine, but he takes St. John's Wort for

his symptoms. 1R188-189.  Camacho has not seen a psychologist or psychiatrist or any

doctor or any type of mental health counselor for his anxiety/sleeplessness/emotional

31

damages, and has never been prescribed any type of medication for that. 1R210.  Two reasons he has not: first, in his line of work as a sobador, it is all about natural healing; and second, he has no medical insurance and did not have the money to pay for medical treatment.  1R226.  Camacho was never physically hurt in jail, and never sought medical attention in jail including for throwing up, sleeplessness, or anxiety.  1R211.

95.     Camacho also lost a significant amount of his business as a "sobador." A "sobado" is an old Aztec Hispanic way of rubbing an injury or relieving someone of pain.  Camacho's emotional response to seeing law enforcement would cause him to cancel his appointments when he would see police cars pass by; the last time it happened was a couple months before the trial. 1R182; 3R207.  Camacho estimated that in 2009 he made $1,500 as a part-time sobador and that in 2010 he made approximately $2,000. 1R209.  Even in 2014, Camacho had episodes where he would cancel his appointments more times than his wife could count. 3R207.

96.     Camacho made approximately $12-14,000 in 2010, $22-23,000 in 2011, $40,000 by 2012, and around $40,000 in 2013, by working with Lucky Dog Shirtz, sabados, and E.C. Repatriation. 1R179-180.

97.     Camacho spent $2,000 to pay his attorney, Mr. Islas, to defend him against the robbery charges. 1R176.

98.     Camacho received a letter from Indoff terminating his employment for low sales and demeanor; he believed that Indoff knew of his arrest.  1R177-178, 206-208.  Camacho provided no hard evidence that Indoff would have known of his arrest.  1R206-208.  He had expected to make over $100,000 a year with Indoff within a year or so.  1R179.  Up till his

arrest on Friday, January 15th, he had only made $300-3,000 with Indoff; he did not remember. 1R204-206. Camacho failed to show by a preponderance of the evidence that his arrest caused Indoff to terminate his employment.

99.    A couple months after Camacho was released, the bank foreclosed on Camacho's house on Firestone due to failure to pay his mortgage. 1R180-181. Before Camacho was arrested, he was at least two months behind on his mortgage. 1R195-196. The bank had already started the process of warning Camacho Sr. about foreclosure. 1R191. Camacho has failed to show by a preponderance of the evidence that his arrest caused the foreclosure of his house.

100.   Camacho had to sell his car days after his release. 1R181. No explanation was provided as to why Camacho sold his car. Camacho failed to show that his arrest caused him to sell his car.

101.   Camacho had previously been arrested approximately six times for traffic violations and some problems that he had with a prior employer, approximately twenty years prior, but had never been detained over night. 1R176-177. Camacho had been arrested between five and ten times for violating a protective order, because during his divorce he lived at his parents' house which was less than two blocks away from the house where his ex-wife was living- all the charges were dismissed. 1R217-220, 226. In 1996 Camacho was arrested for forgery to defraud another; in 1998 for driving with suspended license; in 1999 for misappropriation of financial property between $20,000 and $100,000 (related to the 1996 forgery); in 2000 for injury to a child with intent to cause serious bodily injury (not convicted); and in 2007 for harassment. 1R217-220, 226.

**Credibility Determinations**

102.   The Court finds SA Cannella to be generally not credible.  SA Cannella disputed the title of

lead agent, when all of the other agents referred to her as such regarding the investigation of

the robbery.  *See* 1R30; 2R13; 3R222, 243.  Her testimony that Mercado only caught a

glimpse of the robber is contradicted by her own testimony and SA Perez's 302 of the

witness interview.  2R:167-171; 3R120; PX4, 5.  She testified that she has a fairly

photographic memory, which is undermined by the entire case and highlights her rigid

unreasonable overconfidence in her own memory.  2R205.  She testified that she did not

conclude that Camacho was the robber after she conducted the ruse to see him in person at

his house on Wednesday, contradicting her probable cause affidavit.  2R154; JX6.  She was

unwilling to concede that Camacho's complexion did not match the witness descriptions of

the robber although everyone else who testified agreed that Camacho's complexion was

medium or dark and not light.  1R313; 3R250.  She was unwilling to concede that Camacho

was cooperative.  2R176.  She disputed the character of the Copart check, although

Defendant even argued that the agents were extremely aware that the document was a copy

of a check.  2R215; 4R24; DX20.  She was unwilling to concede that Amy Ramirez or

Therm-O-Link provided even a possible alibi even when Camacho's statement would have

required that he go from Therm-O-Link to the bank in ten minutes.  2R:234-244; 3R83-85.

She testified that on Friday she did not believe that Ramirez had even possible exculpatory

information about Camacho.  2R244.  She testified that Camacho owns Copart when her own

notes indicate Camacho Sr.'s company has a different name.  2R217.  She testified that

Camacho told her that he does not go to the west side of El Paso when her own notes

34

contradict her.  3R65.  Her testimony that Marco pointed to the picture and said "That's my brother" is belied by SA Lonnie M. Camacho's 302 of Marco's interview.  3R75; DX15 .

103.  The Court notes that the interview of the person who did rob the bank, Raul Aron Gallegos, was audio and video recorded.  JX9:10 (FBI U.S. 000250).  Had such recordings been made and available in this case, regarding both Camacho's Thursday and Friday interviews and polygraph examination, the need for the Court to make many of the credibility determinations required to establish the facts in this case would have been obviated.

104.  Polygraph examination results may be considered in determining probable cause.  *Bennett v. City of Grand Prairie*, 883 F.2d 400, 405-406 (5th Cir. 1989) (noting that plaintiff challenged neither the integrity of the particular polygraph exam nor the qualifications of her examiner); *see also Gliatta v. Jones*, 96 Fed. App. 249 (5th Cir. May 10, 2004) (2004 WL 1114469) (unpublished, *per curiam*) (finding results, including a strong indication and indication of deception regarding specific questions supported a finding of probable cause). However, as with other information that may be considered, officers may not disregard facts attendant to the polygraph examination tending to dissipate probable cause.  *See Gliatta*, 96 Fed. App. at 252.  A polygraph test can be affected by, and possibly result in a "false positive indication[] of deception due to some stress or discomfort in the subject[.]"  *See* D.E. 36:3 n. 2; 36-1:4 ¶ 12.  This was one rationale behind Camacho's release on Thursday night.  *Id*. Camacho testified about SA Switzer's instructions and actions leading up to and during the application of the polygraph examination, as well as the fear and overt nervousness that Camacho experienced and SA Switzer observed during the exam due to the questioning techniques employed, such as uncontrollable shaking and profuse sweating.  Camacho's

testimony on this topic was completely unrebutted. *See* 1-4R (SA Switzer was not called to testify); 2R230-231 (SA Cannella testified that she observed at least a portion of the examination through a video feed); 3R261-268 (SA Casey saw a portion of the polygraph via a video feed; he took some notes of a portion of it; he did not know what was discussed prior to hooking Camacho up to the polygraph machine; he did not recall anything about the polygraph other than what was in his notes; it was possible that SA Cannella was with him watching the video); PX39. SA Cannella's testimony that she was told only that the results of the test were indicating deception is not credible. *See* 3R81. Nor is there any testimony or evidence provided by Defendant regarding particulars of the examination results such as specific questions asked and the degree of deception involved. Furthermore, the report of the polygraph examination was not entered into evidence, so the Court lacks the benefit of its particulars. The Court finds that the factors tending to dissipate probable cause based on the facts and circumstances attendant to the polygraph examination overwhelm any support the results could provide to a probable cause finding. Based on the particular facts in this case, the Court finds that no reasonable agent, mindful of the attendant circumstances, would be able to reasonably rely on the polygraph examination results in finding probable cause.

**Conclusions of Law**

**A.    FTCA and False Arrest/False Imprisonment**

1.    Pursuant to the Federal Torts Claims Act (FTCA), the United States can be held liable in tort in the same manner that a private individual would be liable under similar circumstances under the law of the place where the act occurred. 28 U.S.C. § 2671; 28 U.S.C. § 1346(b)(1).

2.     The FTCA withdraws consent to be sued for negligent or wrongful acts of its employees in the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part fo a federal agency or an employee of the Government, whether or not the relevant discretion be abused, 28 U.S.C. § 2680(a). The FTCA also withdraws consent to be sued for "any claim arising out of false imprisonment, false arrest, . . ." unless the claim "resulted from the act or omission of an investigative or law enforcement officer of the United States Government." 28 U.S.C. § 2680(h); *Sutton v. United States*, 819 F.2d 1289, 1294 (5th Cir. 1987). The Fifth Circuit has explained that "law enforcement decisions by U.S. Attorneys on when, where, and how to investigate, and whether to prosecute, fall within the ambit of the discretionary function exception." *Sutton*, 819 F.2d at 1293. But "[a] government agent who departs from the duties of an investigator and embarks on an intentional abuse within the meaning of 2680(h) similarly exceeds the scope of his authority and acts outside his discretion." *Id*. Thus, United States District Judge Kathleen Cardone found that "when the alleged conduct crosses the line from negligent conduct to intentional misconduct or bad faith, the discretionary exception yields to the law enforcement proviso, and the lawsuit can proceed." Doc. 17 at 16.

3.     In the state of Texas, liability is imposed on private individuals for both false arrest and false imprisonment. *See Miller v. Baylor Coll. of Med. Fed. Credit Union*, CIV. A. H-09-1332, 2011 WL 677350, at *4 (S.D. Tex. Feb. 16, 2011). Both claims share the following elements: (1) a willful detention of the plaintiff; (2) without the plaintiff's consent; (3) without authority of law. *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002).

4.     The willful detention of Plaintiff without his consent is not at issue in this case.  Doc. 45.
The only contested element in this case is the agents' lack of legal authority in arresting and
detaining Camacho.  *Id*.

5.     A law enforcement officer has the legal authority to make a warrantless arrest only when
there are "reasonable grounds to believe that the person to be arrested has committed" a
felony. 28 U.S.C. § 3052. The probable cause standard generally required for warrantless
arrests is equivalent to § 3052's "reasonable grounds" requirement. *See United States v.
Campbell*, 575 F.2d 505, 507 (5th Cir. 1978). For this reason, the existence of probable cause
is a complete defense to any claim for false arrest or imprisonment based on a warrantless
arrest. *See Nunez v. Jiminez*, No. 04-07-403-CV, 2007 EL 4320822, at *3 (Tex. App.—San
Antonio, Dec. 12, 2007, no pet.) (Explaining that a false arrest/false imprisonment claim
based on an allegedly improper warrantless arrest turns on whether there was probable cause
for the arrest).

**B.     The probable cause standard**

6.     The Supreme Court has defined probable cause to justify an arrest as the "facts and
circumstances within the officer's knowledge that are sufficient to warrant a prudent person,
or one of reasonable caution, in believing, in the circumstances shown, that the suspect has
committed" a felony.  *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).  It is a "common-
sense determination whether given all of the circumstances" a reasonable officer could have
believed "there is a fair probability that the plaintiff committed the crime." *Illinois v. Gates*,
462 U.S. 213, 238 (1983).

7.    Whether probable cause exists is determined based on the totality of facts and circumstances within the officer's personal knowledge at the time of arrest.  *Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2000).   The Court looks "at the totality of the circumstances and consider[s] the collective knowledge and experience of the officers involved." *United States v. Jones*, 234 F.3d 234, 241 (5th Cir. 2000); *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir. ) cert. denied, 439 U.S. 968 (1978) ("the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observed as trained officers. We weigh not the individual layers but the 'laminated' total.").   Probable cause is determined on the basis of facts available to the officer at the time of the arrest and may be supported by the collective knowledge of law enforcement personnel who communicate with each other prior to the arrest.  *Evett v. DETNTFF*, 330 F.3d 681, 688 (5th Cir. 2003). Although officers may rely on the totality of facts available to them for probable cause, "they also may not disregard facts tending to dissipate probable cause." *Id*.

8.    The Fifth Circuit has further defined the probable cause inquiry to require that an officer ***reasonably*** and honestly believed facts which would cause a prudent person to believe there is a fair probability that the suspect committed a crime.  *Gordy v. Burns*, 294 F.3d 722, 729 (5th Cir. 2002), *abrogated and overruled on other grounds by Castaellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003) (emphasis added).   The probable cause threshold is relatively low; it "does not require a showing that the officer's belief [in the suspect's guilt] was correct or that it was more likely true than false[.]" *Id*.

9.    A suspect's innocence does not, in itself, cancel probable cause or render law enforcement's actions without authority.  *Pierson v. Ray*, 386 U.S. 547, 555 (1967).

10.   The fact that there is exculpatory evidence that may suggest that the suspect is not guilty does not, on its own, undermine the existence of probable cause. *Gordy*, 294 F.3d at 729. However, exculpatory evidence, and facts tending to dissipate the reasonableness of believing in the suspect's guilt to a fair probability, are part of the totality of facts and circumstances that must be considered when making a probable cause analysis; they cannot be disregarded and ignored. *Evett v. DETNTFF*, 330 F.3d 681, 688 (5th Cir. 2003).

11.   Probable cause does not turn on the subjective determinations of the officers involved; "an arresting officer's state of mind (except for the facts that [she reasonably and honestly believed]) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 593 (2004) citing *Whren v. United States*, 517 U.S. 806, 812-813 (1996); *Gordy*, 294 F.3d at 729.  Probable cause turns only on whether, objectively, considering the totality of such circumstances, a prudent person would believe there is a fair probability that the suspect committed a crime.  *Id*.

12.   Although eyewitness identification is generally sufficient to establish probable cause, it does not overcome the required consideration of the totality of the circumstances, including any apparent reason to doubt the identification.  *United States v. Burbridge*, 252 F.3d 775, 558 (5th Cir. 2001) (eyewitness identification is generally sufficient); *See McBride v. Crime Stoppers*, 1994 WL 684541, at *4 (5th Cir. 1994) (unpublished) (considered the totality of circumstances when eye witness identification was called into doubt by discrepancies between identification and original description).

C.      **Facts known on Friday, January 15, 2010**[18]

13.     The Court must examine what facts and circumstances were known to the agents at the time

        Camacho was arrested at approximately 3 p.m. on Friday, January 15, 2010.  The following

        is a summary:

        **a. The robbery**

        (1) On January 12, 2010, a man wearing a beanie and glasses, who was at First National

        Bank from 11:15 a.m. to 11:22 a.m., robbed the bank; (2) $1,833 were stolen; (3) Ramos

        described the robber as in his forties, between 5'4" and 5'5" tall and 130-140 pounds, with

        an average build and a light complexion; (4) Chavez described the robber as a Hispanic male,

        between 35 and 40 years old and 5'3" to 5'4" tall, with an average build and a light

        complexion; (5) Mercado described the robber as a Hispanic male, between 30 and 40 years

        old and 160-180 pounds, 5'5" tall, with light skin, a light beard, glasses with no frames, and

        arched eyebrows, leaving in a black car; (6) a wanted poster was released with a surveillance

        photo of the robber, describing him as a Hispanic male, 35-40 years old, between 5'3" and

        5'5" tall, with a light complexion, lock style goatee, and wire-framed eyeglasses; (7) an FBI

        press release contained the following description: a Hispanic male, between 5'3" and 5'5" tall

        and 130 to 160 pounds, late 30's, average build, with a light complexion, light mustache/beard

        "Candado" style; wearing sneakers; and driving a light-colored, four-door, mid-sized vehicle

        with tinted windows and paper plates displayed in the rear of the vehicle; (8) agents had

        ---

        [18]  The Court previously ruled that the government had sufficient probable cause to arrest
        Camacho on January 14, 2010.  Doc. 45.  For this reason, the Court will only consider
        Camacho's second arrest on January 15, 2010.

        41

viewed surveillance video from 11:15 a.m. to a little after 11:22 a.m; (9) agents obtained surveillance video spanning from 10:15 a.m. to noon from several camera angles.

**b. The tip**

(1) Agents received a tip from Valles, Camacho's ex-girlfriend's best friend, who said that she was still friends with Camacho, that the assailant looked "just like" Camacho; (2) Valles described Camacho as 41 to 42 years old; between 5'5" and 5'6" tall, with a medium build, goatee, glasses, "Chinese eyes," and a distinctive look, driving a black BMW, but with access to lots of cars; (3) Valles also described Camacho as a money guy who had failed at many businesses and the kind of guy that would research to know if a bank had been hit several times; (4) Camacho's ex-girlfriend had seen the picture and was not sure it was him, but said she would not be surprised; (5) TFO Ruiz noted it as a "big problem" that Camacho's records listed him as 5'6"-5'9" and 185-220 pounds.

**c. Identifications**

(1) When viewed in person, SA Cannella found that Camacho's height and weight did not match the consensus description, but SA Cannella, finding Camacho's complexion to be light, was convinced that he was at least a close enough resemblance to continue pursuing; (2) TFO Ruiz agreed that Camacho was close enough to meet the parameters of the consensus description, but considered Camacho's complexion to be medium; (3) SA Hughes and SA Perez both considered Camacho's complexion to be dark; (4) a photo line up was compiled from Camacho's drivers license photo; none of the people in the six total photos were wearing either a beanie or glasses, and there was no indication of height or weight; (5) Ramos selected Camacho's photo immediately with a high level of certainty; (6) Chavez

42

selected Camacho's photo as the person who resembled the man who robbed the bank, and rated her certainty as 8/10; (7) Mercado did not identify anyone; it is unknown whether she viewed the photo line-up; (8) Camacho Sr., a former police officer, acknowledged some resemblance, but said that the man in the surveillance photos was not Camacho; (9) Marco, a current border patrol agent, agreed that one of the pictures looked like Camacho; (10) Marco may have said that he would not be shocked if Camacho robbed a bank; (11) SSA Camarillo did not think Camacho looked like the robber in the surveillance photos.

**d. Cooperation**

(1) Camacho consented to the search of his home and vehicle and told his wife to also consent; (2) Camacho's wife consented to the agents taking the computer; it was in their possession; (3) Camacho continuously waived his rights, did not ask for a lawyer, and agreed to answer the agents' questions; (4) Camacho returned voluntarily on Friday morning to take a polygraph test; (5) when he arrived at 9 a.m. on Friday, Camacho provided the agents a business card and receipt he thought would be helpful in confirming his whereabouts on Tuesday, January 12th; (6) Camacho voluntarily gave a written statement.

**e. Copart**:

(1) Camacho made two visits to the same Capital Bank branch to make cash deposits of $100 and $111 on Thursday, January 14, 2010; (2) a yellow carbon copy of a business check from a company named Copart and made payable to an individual named "Gustavo Espinoza" in the amount of $1,622, which stated "void if over 6 months from check date" and had "non-negotiable" stamped on the signature line, was found in Camacho's house; (3) the amount

43

of the check copy and the two cash deposits totaled $1,833, the exact amount stolen in the bank robbery;

(4) Camacho Sr. said he had seen Camacho on Thursday because Camacho Sr. asked Camacho to stop by and pick up both $100 Camacho Sr. owed Camacho for helping to return a stolen vehicle to the United States and the copy of the check for $1,622 that needed to be returned to Copart; (5) Camacho Sr. explained that he works with Copart and Espinoza to retrieve stolen vehicles from Mexico, the wrecker accidently gave Espinoza the yellow carbon copy of the check, Espinoza gave it to Camacho Sr., and Camacho Sr. gave it to Camacho to return to Copart;

(6) Camacho said that he had the carbon copy of the check because when the Copart wrecker driver paid Espinoza for the vehicle, he gave Espinoza the carbon copy as well and Espinoza gave it to Camacho Sr., who gave it to Camacho to return to Copart; (7) Camacho said that Copart charges fees to the insurance company or the vehicle is sold; (8) Camacho said that Copart pays Espinoza; (9) Camacho said that Espinoza pays Camacho Sr.; (10) Camacho said that Camacho Sr.'s company is E.C. Repatriation; (11) Camacho said that Camacho Sr. pays Camacho; (12) Camacho said that Copart would not pay Espinoza with a cashiers check or money order; (11) Camacho said that Camacho would not pay Espinoza any money, to include a cashiers check or money order.

**f. West side**

(1) A printout from Mapquest was found in Camacho's vehicle with directions from his house on the east side of town to a business on Emory on the west side of town in the vicinity of the robbed bank; (2) Camacho said he does not go to the west side "that much" (3)

Camacho's sister lives on the west side; (4) Camacho said he was never on the west side on Tuesday; (5) Camacho said that he and his wife had visited a delivery service on Emory on the west side on Wednesday, after the school event and before eating lunch at State Line.

**g. Time line**

(1) Camacho had said that he was at Therm-O-Link on Tuesday morning in his professional capacity as an Indoff salesman to establish a sales account with them, and met with the administrative assistant, Ramirez, about office products; they specifically talked about trash cans; (2) On Thursday, Camacho said that he was unsure of the exact times he was at Therm-O-Link, but agreed that it could have been between 9:30 and 10 a.m.; (3) On Friday, Camacho said that an appointment had cancelled around 9:30 or 9:45 a.m. on Tuesday; (4) Camacho said that he went to see Ramirez at about 10:30 a.m. at Therm-O-Link; (5) Camacho said that he arrived at Therm-O-Link around 10:30 or 10:45 a.m.; (6) after the polygraph, he again stated that he was at Therm-O-Link around 10:45 a.m.  (7) Camacho guesstimated on Thursday that he was at Therm-O-Link for approximately 20 minutes and on Friday that he was at Therm-O-Link for approximately 15 to 20 minutes; (8) on Thursday, Camacho said that there was a power outage while he was at Therm-O-Link, and the lights flickered; (9) on Friday, Camacho said that while he was there, the lights flickered on and off and then the warehouse power went out; Ramirez explained to him that a long process was required to restart the machines;  (10) Camacho said that Bustamante passed by when the power went out;  (11) on Thursday, Camacho said that he spoke with another employee while he was there; (12) on Friday, Camacho said he spoke to another employee who was filling out paperwork, putting his mother on his insurance; (13) Camacho said a man named

Chavira gave him a sample of flat back tape; (14) on Thursday, Camacho said that from Therm-O-Link he went home and sent Ramirez an email;  (15) on Friday, Camacho said that he left Therm-O-Link around 11:00 a.m.; arrived home around 11:10 a.m. or 11:15 a.m. or 11:20 a.m.; (18) Camacho said that when he arrived home, he logged on to a secure web page that required him to submit three passwords, he researched the products, and sent Ramirez an email quoting the price of two trash cans; (19) Camacho said that after emailing the product quote to Ramirez, he and his wife went to eat at Contessa, that they left there around 1:30 p.m., and that they then went to his mother's house.

(19) Camacho's wife said that Camacho had run errands in the morning and that she and Camacho had gone out and gone to his mother's, but she could not give a precise time that Camacho was at home or away; Camacho's wife may have said it was possible that Camacho did not come home until 12:30 p.m. on Tuesday; (20) Camacho's mother said that Camacho was at her residence twice on Tuesday, once at 11 a.m. and again at 2 p.m.; (21) Camacho had not said that he saw his mother on Tuesday morning.

**h. Finances**

(1) Camacho said that he has enough money for everything his family needs, that he cannot pay his cell phone bill, but that he does not need a cell phone, and that he can go to his family for money if he needed money; (2) Camacho said that he was struggling at Indoff, but was only giving 20% effort; (3) Camacho's wife said that they were six months behind on mortgage payments; (4) Camacho was delinquent in paying child support; (5) Camacho had received termination notices from the electric company for nonpayment; (6) Camacho had

46

taken a second loan out on his house; (7) Marco disclosed that Camacho had financial problems and difficulty paying his bills.

### i.  Polygraph

(1) Camacho voluntarily submitted to a polygraph; (2) SA Switzer told Camacho that if he answered that he had ever lied to or stolen from someone he loved, the test would be over; (3) Camacho was nervous, scared, terrified while taking the test; he was shaking uncontrollably and sweating profusely; (4) Camacho answered that he had never lied to nor stolen from someone he loved; (5) SA Switzer told Camacho that he had failed the polygraph; (6) Camacho continued to assert his innocence and asked them to call Ramirez; (7) agents questioned Camacho for approximately another 45 minutes; (8) the agents told Camacho that Marco had identified him as the robber; (9) Camacho maintained his innocence and again asked them to call Therm-O-Link.

**D.    Probable Cause analysis of the arrest on Friday, January 15th**

14.    Probable cause considers the totality of the facts and circumstances an officer ***reasonably*** and honestly believes.  *Gordy*, 294 F.3d 722.   The evidence in this case demonstrates that SA Cannella's asserted beliefs about some of the facts and circumstances uncovered in the investigation were not reasonable.   Some of her beliefs appear to be the product of confirmation bias, selective information processing, and belief perseverance, or tunnel vision, once SA Cannella had formed the opinion that Camacho was guilty.  For example, SA Cannella believed that the Camachos owned or operated Copart, although the name of Camacho Sr.'s company, E.C. Repatriation, was reflected in her written notes.   This unreasonable belief led SA Cannella to equate Copart with the Camachos, causing her to find

47

Camacho's explanation of the Copart check inconsistent with Camacho Sr.'s explanation although they were consistent. SA Cannella also unreasonably asserted that Camacho had said that he had enough money to pay all his bills, when Camacho himself had acknowledged, as reflected in SA Cannella's notes, that he did not. SA Cannella also unreasonably asserted that Camacho had said that he never goes to the west side, when Camacho had said only that he does not go to the west side "that much" and actually told SA Cannella about going to the company on Emory and then going to eat lunch at State Line on Wednesday. Finally, SA Cannella unreasonably clung to the belief that Therm-O-Link was not even a potential alibi, although Camacho was uncertain of the time of events on Thursday and only had a better guestimate of the time on Friday, based on his recollection of the cancelled appointment. His more detailed account on Friday would have required Camacho to potentially drive approximately 26 miles in 10 minutes to commit the robbery. Because SA Cannella was the lead agent, she was the agent synthesizing all of the information gathered in the investigation, and the one to convey such information to her supervisor and the Assistant United States Attorney in obtaining authorization to make the arrest; thus, her unreasonable assertions tainted the probable cause determination.

15. The probable cause question, however, is not subjective, but objective. The Court must, therefore, determine whether any reasonably prudent agent, with the information that was in front of SA Cannella, could have reasonably believed that there was a fair probability that Camacho committed the robbery.

16. Although eyewitness identification is generally sufficient to establish probable cause, there were discrepancies between the witnesses' photo identification and their original description;

48

a dramatic difference between seeing the robber in person in a beanie and glasses and the photo lineup with neither beanie nor glasses, nor any indication of height or weight; and the witness providing the tip had a potential bias against Camacho, who was an ex-boyfriend of her best friend. *See McBride*, 1994 WL 684541, at *4.  SA Cannella herself, after seeing the video of the robbery, the photos taken from the video, and Camacho in person, thought only that he was a close enough resemblance to follow up on.

17.   Camacho was nervous, but consistently cooperated by consenting to the search of his home and vehicle, waiving his rights, not asking for a lawyer, agreeing to answer the agents' questions, returning voluntarily to take a polygraph test, providing documentation to support his account of his whereabouts, and voluntarily giving a sworn written statement.

18.   Camacho's time line for Tuesday was consistent from Thursday to Friday, except that he provided greater detail on Friday and the time frame—which he conveyed he was not certain of on Thursday—was shifted by approximately 30 to 45 minutes based on his recollection of when a client had cancelled an appointment.  The client might have been able to verify the cancelled appointment.   Both Veronica and Camacho's mother's recollections were contradictory.  However, they were both interviewed in the emotional state of having just had a husband or son arrested for robbery, and even at the time of giving their statements, had expressed that they were not entirely sure they were remembering correctly.

19.   Camacho's accounts of his Tuesday events on Thursday indicated that he left Therm-O-Link between 9:50 a.m. and 10:20 a.m., and on Friday that he left Therm-O-Link between 10:45 a.m. and 11:05 a.m.  The fact that Camacho's account of events did not put him at Therm-O-Link during the robbery and that he kept asking the agents to call Ramirez suggests that

Camacho did not know, and was never told, the precise time the robbery took place or that his account did not exclude the possibility that he committed the robbery.  It also might suggest that he realized that his time estimates might be inaccurate and that Ramirez might be able to provide more accurate information.

20.   Camacho failed the polygraph examination; but had volunteered to take it and had appeared for on his own volition, without an attorney, and with several family members for support, bringing with him additional evidence to support his account of events.  Morever, Camacho was told that the test would end if he answered certain questions in a way that virtually everyone would have to answer them in order to answer truthfully, and Camacho was shaking uncontrollably and sweating profusely throughout the test, all of which undermines any reasonable basis for reliance on the test results.  No evidence was provided to controvert Camacho's testimony or to reflect precisely what questions were asked, the answers, or the degree of deception indicated, or if any of Camacho's responses did not indicate deception, given his heightened state of agitation.

21.   While agents knew that Camacho had made two bank deposits and had a yellow carbon copy of a check in his possession that, together, suspiciously totaled the amount stolen from the bank, the agents had also obtained consistent, plausible, innocent explanations from both Camacho and Camacho Sr. (and verifiable by at least two other sources) regarding the significance of the copy of the third-party check and why it was in Camacho's possession.

22.   Camacho provided an explanation for the Mapquest directions.  Veronica and the person at the business Camacho said he visited on Emory might be able to verify his explanation.

23.   Finally, Camacho's statement that he had enough money for everything his family needs, was not consistent with the financial difficulties the agents had discovered from Veronica, his mother, and Marco. However, Camacho acknowledged that he did not actually have enough money to pay his bills, using his cell phone as an example and stating he did not need his cell phone. He also stated that he could go to his family for money if he really needed the money.

24.   Given the facts and circumstances that were before SA Cannella, the Court concludes that no reasonably prudent officer could have reasonably believed that there was a fair probability that Camacho committed the robbery. A possibility, yes, but that is insufficient.

25.   After reviewing all of the facts and circumstances known to the agents and in front of SA Cannella at the time of Camacho's arrest on January 15th, this Court concludes that Camacho has shown by a preponderance of the evidence that no reasonably prudent officer would have believed that there was a fair probability that Camacho committed the bank robbery on January 12, 2010. Thus, Camacho has established that probable cause for his arrest on Friday, January 15, 2010 was lacking.

26.   Without probable cause, there was no legal authority for Camacho's arrest and detention between Friday, January 15, 2010, and Tuesday, January 19, 2010. The Court finds that Camacho has established by a preponderance of the evidence that he was falsely arrested and detained under Texas law.

27.   In determining probable cause, an agent is required to consider the totality of the circumstances and may not disregard facts tending to dissipate probable cause. *Evett*, 330 F.3d at 688. SA Cannella demonstrated an unwillingness to consider, or even recognize, any facts tending to dissipate probable cause throughout the investigation and particularly at the

51

point of Camacho's arrest on Friday, January 15th.  Evidence of SA Cannella's bravado throughout the investigation, and her distortion of certain facts in her probable cause affidavit, reflect the extent to which her ego took precedence over her duty to properly weigh and consider, and not disregard, any evidence that tends to dissipate probable cause.  The Court finds that SA Cannella's conduct crossed the line from negligent to intentional misconduct, or at a minimum bad faith.

**E.**    **Damages available under the FTCA**

28.    Camacho was deprived of his liberty for approximately four nights and five days, from his arrest at approximately three o'clock in the afternoon on Friday, January 15th, to the time he was detained  pursuant to the criminal complaint and supporting affidavit signed by the Federal Magistrate Judge on Tuesday, January 19th.

29.    Under the FTCA, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances," though not "for interest prior to judgment or for punitive damages." 28 U.S.C. §2674.

30.    "In setting a damage award in a false imprisonment case, the [fact-finder] may look to all injuries [of Camacho], not limiting consideration to those that are physical in nature, but also including the more intangible injuries of humiliation, shame, fright, and anguish." *Wal- Mart Stores, Inc. v. Odem*, 929 S.W.2d 513, 527 (Tex. Civ. App.– San Antonio 1996, writ denied).

31.    Camacho spent $2,000 to pay an attorney, Mr. Islas, to defend him against the charges.

32.    While in jail from Friday to Tuesday, Plaintiff suffered fear, terror, a total sense of loss, anxiety, shame and embarrassment, loss of sleep, nightmares, physical symptoms such as

headaches, throwing up and losing his bowels, and a periodic inability to breathe due to anxiety.

33.    After he was released, as a result of his Friday arrest, Plaintiff continued to experience difficulty sleeping; nightmares; paranoia; decreased energy during the day; headaches; moodiness; depression; anxiety; weight gain; panic attacks triggered by seeing law enforcement, manifested by: racing heart, inability to breathe, feeling nervous and scared, and occasionally vomiting or losing his bowels; and heightened nerves, manifested by: jumpiness, shaking, and perspiring.  Although many of the symptoms have decreased in frequency or intensity since 2010, Plaintiff continues to experience the mental and physical side effects of his false arrest and subsequent time in jail.

34.    In determining damages, the Court has considered evidence of Camacho's prior arrest history.  While of some relevance, the Court notes that none of Camacho's prior encounters with law enforcement resulted in him spending even one night in jail, but were rather limited to only a number of hours of detention before being released.

35.    The Court finds that the following were not caused by the false arrest: Camacho's termination from Indoff; the foreclosure on his home; and the sale of Camacho's car.

36.    Although Plaintiff may have lost income from sabados, Lucky Dog, or E.C. Repatriation due to lost customers or the mental and physical side effects of his false arrest, causing him to cancel appointments, Plaintiff did not provide sufficient evidence for the Court to determine how much income was lost.

37.     The Court finds that Camacho is entitled to damages in the amount of  $402,000.00  for

attorney fees paid to Mr. Islas to defend against the robbery charges and for Camacho's

mental and physical anguish.

The Court will issue a separate final judgment in accordance with these findings as required

by Federal Rule of Civil Procedure 58(a).

**SIGNED** and **ENTERED** on March 23, 2015.


_____

ROBERT F. CASTANEDA
UNITED STATES MAGISTRATE JUDGE